**FERAG AG, an Alien Corporation, and Ferag, Inc., a U.S. Corporation, Plaintiffs,**

v.

**GRAPHA-HOLDING AG, an Alien Corporation, Defendant.**

**Civil Action No. 91–2215–LFO.**

United States District Court, District of Columbia.

July 19, 1996.

Richard G. Lione, Gary M. Ropski, Glen P. Belvis, Thomas J. Filarski, Lalita P. Williams, Thomas E. Wettermann, Brinks Hofer Gilson & Lione, Chicago, IL, for Plaintiffs Ferag AG and Ferag, Inc.

David R. Francescani, Robert C. Sullivan, Jr., Alexandra D. Malatestinic, Joseph R. Robinson, Darby & Darby, P.C., New York City, Michael T. Platt, Dickinson, Wright, Moon, Van Dusen & Freeman, Washington, D.C., for Defendant Grapha–Holding AG.

## MEMORANDUM

OBERDORFER, District Judge.

### I.

Plaintiff Ferag AG is a family-owned Swiss corporation, with its principal place of business near Zurich; and plaintiff Ferag, Inc. is Ferag AG's U.S. subsidiary. The two companies are referred to here collectively as "Ferag". Defendant Grapha–Holding AG is also a family-owned Swiss corporation, with its principal place of business near Zurich—a few kilometers from Ferag. The parties are "two of only a very few companies that manufacture bindery equipment used to assemble or join together pages of brochures and magazines." *Ferag AG v. Grapha–Holding AG,* 905 F.Supp. 1, 2 (D.D.C.1995). They compete furiously worldwide. One arena of competition is patent litigation. Each holds numerous patents on its products and elements of them issued by several governments, including the United States, and are vigorously litigating issues about the validity of the patents and infringement.

At issue in this case is Grapha's U.S. Patent No. 4,735,406, referred to by the name of "Weber", the Grapha employee who disclosed and claimed as his invention a rotary drum "gatherer-stitching" machine "for making brochures and the like." A copy of the Weber patent, issued on April 5, 1988, is attached here as Appendix A. The issue is drawn by Ferag's prayer for a declaratory judgment that the Weber patent is invalid and that no Ferag machine infringes it. Grapha counterclaims that Ferag's rotary drum "IPEX" machine infringes the Weber patent, although Grapha has never manufactured or sold the rotary drum machine disclosed by the Weber patent. During a 13–day bench trial concluded in May 1996, the parties adduced elaborate proof, illuminated by models and prolific expert testimony. The evidence yields the following:

The basic binding machine, a gatherer-stitcher, gathers or accumulates individual folded sheets, known in the trade as "signa-

tures", one over the other along their folded edge or spine with the cover being the outermost sheet; places the sheets spine-up over a saddle; and stitches or staples them together along the fold line. The industry standard gatherer-stitcher, including those manufactured and sold by Grapha, is an "in-line" machine, which receives sheets from automated signature feeders and moves the spine-up sheets linearly down a straight gathering chain to the stitcher.

In contrast, Grapha's Weber patent discloses a gatherer-stitcher that would not only move signatures linearly down a chain, but also circularly around a rotary drum. That is, the Weber machine would deposit individual sheets spine-up on carriers which resemble the fins of a paddle-wheel-type rotary drum. Sheet feeders arranged axially along the drum, one downstream from another, would deposit individual sheets on the fins one after the other as the fins rotate past the feeders. At the same time, the individual sheets would move axially along the gathering fins. Each sheet would follow a helical path while moving along the length of the drum. The carriers would advance the sheets to the stitching station, where they would be stapled or stitched together. The stitchers would include two or more staple applicators mounted on a yoke that would be concentric to the drum and would move in a pendulum manner with the drum.

The machine disclosed by Grapha's Weber patent would also differ from Grapha's own conventional in-line gatherer-stitcher in that the patent claims that the Weber machine would be capable of producing 40,000 copies per hour, whereas the top in-line stitchers, including Grapha's, are capable of producing only 20,000 copies per hour. Although Grapha commands a substantial U.S. share position in the gatherer-stitching market, it has never made or sold a machine covered by any claim of the Weber patent, and in fact, has never constructed a prototype or working model of the machine shown in figure 1 of the Weber patent. *See* Stip. Facts ¶¶ 38, 40. Grapha's top product is an in-line gatherer-stitcher which produces a maximum of 20,000 copies per hour.

Unlike Grapha, in 1991, Ferag briefly offered for sale a rotary drum machine known as "Print '91"; and in 1993, Ferag constructed and exhibited a demonstration machine of a rotary drum gatherer-stitcher at its facility in Bristol, Pennsylvania. More important, Ferag presently manufactures and sells an unpatented, high speed, rotary drum gatherer-stitcher, the "IPEX" machine: Ferag's IPEX machine is capable of binding and stitching at 40,000 copies per hour. There are six IPEX machines operated by Ferag customers in the United States.

The IPEX machine consists of a rotary drum, the circumference of which has forty radially protruding fins. A rotary drum's "fin" is one in-line chain's "saddle". These fins extend along the length of the drum. A gripper conveyor delivers folded signatures to the drum. As each signature, held in a gripper at the fold line, moves toward the drum, a star wheel opener separates the two panels of the folded signature. A gripper conveyor and the feeder screw position each signature over an outer edge of one of the fins, guide the signature onto the fin with the signature's panels straddling the fin, whereupon the gripper conveyor releases the signature. As the drum rotates, the first signatures move circularly for approximately 270 degrees. Only as the signatures reach the last quarter of their rotation around the drum do they move axially by a control slide to the next feeding station, where the process repeats itself. When the signatures reach the stitching station near the end of the drum, a rotatable stapling apparatus, comprised of a carrier rotating in a direction opposite to that of the gatherer-stitcher drum and containing ten stapling heads, staples serially, one signature at a time. The stapled signatures then move axially into the exit station.

In order to protect its rotary drum gatherer-stitchers from claims of infringement, Ferag seeks a declaratory judgment that Grapha's Weber patent is invalid and unenforceable, and even if valid, is not infringed by Ferag's IPEX, Print '91, and Bristol dem-

onstration machines.[1] Primarily, Ferag contends that the Weber patent is invalid because it claims a gatherer-stitcher machine that was known before Weber described his invention and that the machine Weber claimed to have invented was obvious to those of ordinary skill in the art as it developed prior to June 1985, the date the Weber patent application was first filed in Switzerland. Grapha defends Weber's patent and counterclaims for a declaratory judgment that the Weber patent is valid and enforceable, and that Ferag infringed the Weber patent by manufacturing, using, offering for sale, and/or selling the unpatented IPEX, Print '91, and Bristol demonstration machines.

## II.

### A.

In explanation of the competing claims, the parties generally agreed about the role of gatherer-stitching machines in the print-bindery industry: After the printing press finishes printing the pages of a newspaper or magazine, the bindery machine assembles and stitches them into the finished product. For the last 40 years, the in-line gatherer-stitcher has been the industry standard for assembling magazines. This machine gathers or accumulates individual folded sheets or "signatures" on a linear gathering chain, one over the other along their folded edge or spine with the cover being the outermost sheet. This is known in the trade as accumulating sheets from the "inside-to-outside." The in-line gatherer-stitcher places the sheets over a saddle, and stitches or staples them together along the fold line. Well-known examples of gatherer-stitched magazines are *Time* and *Newsweek*. Currently, the top speed or rate of production for an in-line gatherer-stitcher is 20,000 copies per hour. Because the output of a printing press typically outpaces the output of bindery machines, it is often necessary to store unbound pages, a costly and time-consuming step. To save this time and expense, the bindery industry is constantly in search of binding

equipment which more nearly matches the speed of the printing press.

The industry's demand for greater bindery speed has been frustrated by the fact that on a conventional in-line gatherer-stitcher, each sheet must be individually transported through the machine; therefore, higher output can be achieved only by increasing the speed of the sheets as they travel along the gathering chain. But speeding the movement of paper linearly can create many difficulties such as air currents, which flutter and tear the sheets. To minimize such difficulties, the speed at which the sheets can be moved linearly is limited, with consequent finite limits on the production rate achievable by an in-line machine. *See* Weber patent, col. 3, ll. 8–9. Moreover, on in-line chains, the sheets change the direction of their movement roughly ninety degrees when they drop from the feeder to the gathering chain. This abrupt change in direction, if it occurs at high speeds, often causes the pusher on the gathering chain to drive through the sheets and damage them. *Id.* at col. 1, ll. 34–37.

Weber's patent addressed these problems by designing a machine that would change the conventional in-line gatherer-stitcher processing of sheets by putting several straight in-line chains onto a rotary drum, thereby moving paper circularly as well as linearly. Weber claimed that such a rotary drum machine would increase the time to deposit sheets; reduce the axial speed of the sheets thereby eliminating the problems associated with paper traveling at high speeds; reduce the abrupt changes in the direction of the paper; and increase the time for stitching. The evidence is clear and convincing, however, that the idea of putting straight in-line carriers on a rotary drum did not originate in 1985 with Weber or with Grapha; Ferag earlier designed and produced a rotary drum binding machine.

In 1976, Ferag received a U.S. patent for a rotary drum inserter for handling sheets of paper in newspaper assembly. A copy of

---

1. For purposes of this litigation, the IPEX machine is representative of Ferag's rotary-drum gatherer-stitchers.

this patent, the "Reist" patent, U.S. Patent No. 3,951,399, which issued on April 20, 1976, is attached as Appendix B. In contrast to magazines, newspapers are normally assembled from the "outside-to-inside" in a pocket in the shape of an open "V", that is, the cover or "outside" goes into the pocket first, followed by the inside pages. This process is known as "inserting"; there is no stapling or stitching in newspaper assembly. The Reist patent's rotary drum allowed the signatures to move closely together, reducing the speed at which they must move through the machine. The Reist rotary drum concept also permitted reduction of the distance between the signatures below the length of the signature—impossible on an in-line machine—and also enabled the machine to work with the shortest possible dimension or depth of paper. This design resulted in an extraordinarily high output capacity even though paper did not move through the rotary drum machine at the high speed which creates disturbing air flow in on-line machines.

Specifically, the Reist machine included a horizontally elongated drum. In the embodiment shown in figures 1 to 6 of the Reist patent, the outer sheet or cover of a publication is fed into a drum between the dividing walls of a section of the drum as it rotates. As the drum rotates, the sheets move axially along the drum in a "generally helical" path until the sheets reach the second section of the drum. Pl.'s Findings of Fact ¶ 24. The path is only "generally helical" because, as illustrated in figure 2 of the Reist patent, the path actually becomes circular (i.e., no axial movement takes place) over the top of the drum. As the sheets rotate under the drum, an endless belt forms a kind of trough under the drum, preventing the sheets from falling out at the bottom of the drum's cycle. After the sheets have rotated completely around the drum and have moved under the second feeding station, more sheets are inserted into the first section of the drum. The sheets continue to rotate with the drum and to move axially, following a "generally helical" path.

Although the Reist patent disclosed a machine primarily for inserting or newspaper assembly, it also proposed some modifications: "the above described apparatus is not limited to the insertion of inserts into articles. . . . [I]t is possible for numerous other operations to be performed. . . ." Reist patent, col. 8, ll. 7–11. The relevant modification here is that the Reist patent claimed that: "Assembly may also take place from the inside to the outside, the innermost section being supplied to one end of the wheel and the successive further outwardly disposed sections being supplied subsequently." *Id.* at col. 8, ll. 36–37, 42–46. This statement strongly suggested that the Reist rotating drum machine could assemble sheets from the "outside to inside" in a pocket and could also assemble them from the "inside to outside" on a saddle. Although the Reist patent did not specifically state that "inside to outside" assembly occurs on a saddle, it is a necessary inference that "inside to outside" assembly is feasible only on a saddle such as traditionally used in an in-line machine. May 22, 1996 Trial Tr. at 15–16 (Boss cross).

As early as 1980, Ferag produced and sold the Reist machine and quickly became identified with the high-capacity rotary drum concept in the bindery industry. Its commercial newspaper inserters were the state of the art and well-known in the industry, including Grapha. Pl.'s Ex. 395 (Grunder dep. at 152–53). Ferag's Reist rotary drum inserting machines were also a tremendous commercial success. To date, it has sold over sixty of these machines in the United States, including one at a newspaper bindery in Springfield, Illinois and another at Bergen, New Jersey. *See* Pl.'s Exs. 372, 373, 379 (Springfield); Pl.'s Exs. 381, 382 (Bergen).

In 1980, Ferag's head of research and development at that time, Jacques Meier, used the Ferag rotary drum concept to design a rotating drum gatherer-stitcher. The U.S. patent for this design, the "Meier '755" patent, U.S. Patent No. 4,408,755, issued on October 11, 1983 based on a Swiss application filed March 11, 1980. The Meier '755 patent shows a rotary drum with 24 saddles spaced evenly from each other around the drum's circumference. On these saddles, webs of paper (as distinguished from individual sheets of paper) move axially along the length of the drum until they reach the drum's end, where a rotating cylinder stitch-

ing apparatus at the end of the drum inserts staples serially on one set of sheets after another.

In 1982, Ferag assigned a team of research and development engineers, namely, Werner Honegger, Egon Hansch, and Erwin Muller, the task of designing a high speed, rotating drum *gatherer-stitcher* capable of operating on individual sheets of paper using the Reist patent's rotary drum *inserter* technology. Muller's initial responsibility was to perfect a stitching system for a rotating drum gathering machine. In the process, Muller conceived of an entire system for opening, gathering, and stitching signatures using the Reist rotating drum inserter. Although the Reist inserter used pockets for inserting, and not fins or saddles, it was well-known by 1980, as evidenced by the 1976 Macke patent, that the equipment used to accomplish different ways of assembling products, that is, inserting for newspapers and gatherer-stitching for magazines, could be broadly and flexibly combined to do either. *See* Pl.'s Ex. 71 (Macke patent); Pl.'s Ex. 389 (Higgins stmt. at 39). In his engineering drawings, completed in September and October 1982, Muller proposed a gathering drum for single sheets with a stitching unit for each gathering fin or saddle; Muller also proposed that each sheet be opened and placed in a straddling relationship on the saddles. *See* Pl.'s Ex. 391 (tabs 3–15).

After this initial design work in 1982, Ferag did not immediately pursue a rotary drum gatherer-stitcher nor did it seek a patent on Muller's concept; it believed that the system was covered by the Reist patent. May 15, 1996 Trial Tr. at 124–25, 148–50 (Muller direct, cross). Two years later, in April 1984, Ferag turned once again to the task of designing a high speed, rotary drum gatherer-stitcher and assigned it to Egon Hansch, one of the original engineers on the project in 1982. From April 1984 to July 1986, Hansch worked on the project using, as the nucleus for his design, Muller's unpatented concept and the patented Reist rotary drum inserter technology, as well as the patented innovations of Meier and Macke. Hansch considered two variations on the Reist rotary drum technology: a "Ferris wheel" drum, in which

the sheets always remain vertical, and a "star-shaped" drum. Hansch designed, among other things, the schematic drawings of an inside-to-outside-gathering, rotary drum saddle machine which could open and feed individual sheets onto the fins of a rotating drum using moving belts to prevent the product from falling off the fins when rotated to the bottom of the drum, drawn directly from the Reist invention. *See* Pl.'s Ex. 392 at tab 13. In so doing, Hansch borrowed considerably from existing Reist inserter technology. For example, in designing the use of moving belts to prevent the product from falling off the fins when rotated to the bottom portion of the drum, he proposed using the same belts used on Ferag's inserter drums. The feeding mechanism he designed is identical to the feeding mechanism employed on the Reist inserter drum where the product is gripped at the fold.

Ferag built and tested a prototype of the ferris wheel, rotary drum gatherer-stitcher in 1984. Between 1985 and mid–1986, Ferag continued to develop the ferris wheel rotary drum gatherer-stitcher and shipped a prototype of this design to a German client. In 1987, after studying the advantages and disadvantages of a number of variations of the rotary drum concept, Ferag replaced the ferris wheel approach with the star-shaped drum design. From 1987 to 1990, Ferag worked on the engineering and construction of a star-shaped rotary drum gatherer-stitcher. In 1990, after the issuance of Grapha's Weber patent, Ferag built and exhibited a prototype of the rotary drum gatherer-stitcher at the DRUPA exhibition in Dusseldorf, Germany. Ferag modified this prototype and since 1993, has manufactured and sold it as the IPEX machine, which Grapha claims infringes the Weber patent.

**B.**

During this same time period, Grapha also considered using Ferag's Reist rotating drum invention as the nucleus for a high speed, rotary drum gatherer-stitcher. In January 1982, having studied Ferag's Reist inserter drum and the Reist patent, Heinz Boss, a Grapha engineer, concluded that single sheets could be assembled over the fins

or panels of a rotating drum inserting machine. He recorded his ideas in a number of illustrations signed and dated January 1982. *See* Pl.'s Exs. 23, 33. His illustrations detail a rotating drum gatherer-stitcher having eight carriers, on which single sheets are deposited "inside to outside" over saddles.

In August 1984, independent of the earlier design work of Heinz Boss and without any knowledge of it, Weber, also a Grapha engineer, designed the rotary drum gatherer-stitcher, which he patented and assigned to Grapha as the Weber patent. Like Boss, Weber was aware of Ferag's Reist patent and inserter drum. Weber recorded his work in, among other documents, a morphological box in which he divided tasks to be performed by a machine into partial functions and sources where one could look for solutions to each part of the problem. Pl.'s Ex. 5. From this morphological box, he could determine the best solution to particular problems. Column 5 of this box addressed how to put a signature over or into another signature. In Box D–5, Weber suggested the solution as the inserting process of the Reist patent. Boxes F–10 and F–11 in the morphological box also illustrate the Reist rotating-drum concept.

Weber also wrote a "Study Report," in which he detailed the results of his experimentation and work and discussed the pertinent prior art and possible patent protection. In it, he noted that "there will have to be a comprehensive and clear delineation of features in terms of patent protection since a similar design approach already exists in the realm of newspaper processing." Pl.'s Ex. 21 at 6. This "design approach" was Ferag's Reist inserter drum. And the same advantages claimed by Weber in his patent—that a rotary drum machine would reduce the axial speed of the sheets thereby eliminating the problems associated with paper traveling at high speeds and reduce the abrupt changes in the direction of the paper—were those achieved by Ferag's Reist inserter machine.

Although it has always been Grapha's goal to increase the speed of its gatherer-stitcher to equal that of the printing presses and although Grapha considered Weber's design to be revolutionary, Grapha never made either of the rotary drum gatherer-stitchers described in Weber nor made a machine covered by any claim of the Weber patent. Stip. Facts ¶¶ 38, 39, 40. Grapha did not attempt to commercialize the Weber patent because it believed, among other things, that in 1985, the market was not ready for rotary drum gatherer-stitcher. May 22, 1996 Trial Tr. at 38 (Boss cross). Furthermore, Grapha realized that by 1985, because of the Reist inserter drum, the rotating drum principle had become Ferag's marketing image, so that Grapha's manufacture of a rotary drum could be perceived as a "me-too" to Ferag's Reist rotating drum inserter. May 22, 1996 Trial Tr. at 38–42 (Boss cross); Pl.'s Ex. 395 (Grunder dep. at 80–81).

### III.

#### A.

■ The legal principles applicable to the foregoing facts are not in serious dispute. As a matter of statute, Grapha's Weber patent-in-suit "shall be presumed valid." 35 U.S.C. § 282. It remains valid until the party asserting invalidity proves by "clear and convincing evidence" that the patent "is no longer viable as an enforceable right." *Roper Corp. v. Litton Sys., Inc.*, 757 F.2d 1266, 1270 (Fed.Cir.1985). Nevertheless, it was long ago established that "[i]t was never the object of [the patent] laws to grant a monopoly for every trifling device, every shadow of a shade of an idea, which would naturally and spontaneously occur to any skilled mechanic or operator in the ordinary progress of manufactures. Such an indiscriminate creation of exclusive privileges tends rather to obstruct than to stimulate invention." *Atlantic Works v. Brady*, 107 U.S. 192, 200, 2 S.Ct. 225, 231, 27 L.Ed. 438 (1883); *see also Goodyear Tire & Rubber Co. v. Ray-O-Vac Co.*, 321 U.S. 275, 279, 64 S.Ct. 593, 594–95, 88 L.Ed. 721 (1944) (Black, J., dissenting). Indeed, to justify the issuance of a patent, a "genuine 'invention' or 'discovery' must be demonstrated 'lest in the constant demand for new appliances the heavy hand of tribute be laid on each slight technological advance in the art.'" *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 230, 84 S.Ct. 784, 788, 11 L.Ed.2d 661 (1964) (Black,

J.) (quoting *Cuno Engineering Corp. v. Automatic Devices Corp.*, 314 U.S. 84, 92, 62 S.Ct. 37, 41, 86 L.Ed. 58 (1941)). Therefore, a patent may not be obtained for the product of mere mechanical skill or for simply carrying forward the application of a prior device with a change only in degree. *See Phillips v. Detroit,* 111 U.S. 604, 608, 4 S.Ct. 580, 582–83, 28 L.Ed. 532 (1884); *Smith v. Nichols,* 88 U.S. 112, 22 L.Ed. 566 (1874).

Ferag identifies five independent grounds for its challenge to the validity of the Weber patent, any one of which would invalidate the patent. Specifically, Ferag argues that the Weber patent is invalid because: (1) it defines a gatherer-stitcher machine that was known before Weber designed his machine and that the concept of the Weber machine was obvious to those of ordinary skill in the art prior to June 1985, the date the Weber patent application was first filed in Switzerland, in violation of 35 U.S.C. § 103; (2) it fails to disclose the best mode of the invention as required by 35 U.S.C. § 112, ¶ 1; (3) it does not contain an enabling disclosure as required by 35 U.S.C. § 112, ¶ 1; (4) it lacks utility as required by 35 U.S.C. § 101; and (5) certain of its claims are not definite as required by 35 U.S.C. § 112, ¶ 2. In the circumstances here, it is unnecessary to resolve the issues of best mode, utility, and indefiniteness. Ferag has shown by clear and convincing evidence that, at the time of its filing, Weber's invention was invalid because the claimed invention was obvious to those of ordinary skill in the art within the meaning of 35 U.S.C. § 103, and does not contain an enabling disclosure as required by 35 U.S.C. § 112.

### B.

█ It is black letter patent law that if the differences between the subject matter sought to be patented and the prior art would have been obvious at the time the invention was made to a person having ordinary skill in the art to which the subject matter pertains, that subject matter is not patentable. 35 U.S.C. § 103. The resolution

of an issue with respect to obviousness requires four factual inquiries as to: (1) the scope and content of the prior art; (2) the differences between the claimed invention and the prior art; (3) the level of ordinary skill in the art at the time of the invention; and (4) objective evidence of obviousness or nonobviousness. *See Graham v. John Deere Co.,* 383 U.S. 1, 17–18, 86 S.Ct. 684, 693–94, 15 L.Ed.2d 545 (1966).

█ The scope of the prior art is evidenced by public information "reasonably pertinent to the particular problem with which the inventor was involved." *Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530, 1535 (Fed.Cir.1983). The problem confronting both parties was how to make the bindery machine faster than the standard in-line gathering machine. The rotary drum inserter had already achieved an output of 40,000 newspaper copies per hour. Its concept was the obvious point of departure to gatherer-stitching for magazines. Acknowledging its debt to the Reist inserter, Grapha nevertheless asserts that in June 1985, the prior art did not disclose a rotary drum gatherer-stitcher which deposited, transported, accumulated, and stitched individual folded sheets along the tops of the fins of a drum; and that therefore, the Weber invention was patentable. Ferag counters that the elements of the Weber patent were already disclosed by a combination of the Reist patent or inserting machine, the Macke patent, the Meier '755 patent, the Meier '754 patent, and the Meier '930 patent.[2]

█ The Patent and Trademark Office cited and considered the Reist patent during the prosecution of the Weber patent. It apparently did not cite or consider the Macke patent and the Meier '755 patent. When an accused infringer attacks the validity of the patent on the basis of prior art already considered by the Patent and Trademark Office, as is the case with the Reist patent, the presumption of patent validity is more difficult to overcome because of the deference

---

**2.** As stated earlier, *see supra* at 1242–1243, in 1982 and in 1984, before Weber filed his Swiss application in June 1985, Ferag engineers had already drafted drawings of rotary drum gather-er-stitchers that were later used in the design and manufacture of the IPEX machine. These drawings were not public and therefore do not constitute "prior art."

due to a qualified government agency presumed to have properly done its job. *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1359 (Fed.Cir.1984). Nevertheless, I find that the Reist patent clearly and convincingly suggested the Weber device when Reist claimed that the "above-described embodiments may be used for performing a variety of operations," such as assembling "from the inside to the outside." Reist patent, col. 8, ll. 34–43. I also find that the Reist patent, the Reist inserter, the Macke patent, and the Meier '755 patent disclose all the necessary elements of the Weber patent and, furthermore, teach that such elements may be combined in order to produce a rotary drum gatherer-stitcher.

The Reist patent and the Reist commercial inserter teach that the speed with which signatures could be assembled on linear carriers would be increased by mounting a plurality of the carriers in a drum-like arrangement and rotating the carriers past signature feeding devices while transporting the signatures axially. This is precisely the principal advantage sought by the Weber patent. Furthermore, although the Reist patent primarily shows a rotary drum machine for inserting folded sheets into newspapers, it also teaches to a person skilled in the art that the invention it described could be configured to gather sheets from "inside-to-outside" in the manner of magazine assembly. *See* Reist patent, col. 8, ll. 36–37, 42–46; May 17, 1996 Trial Tr. at 435–36 (Higgins cross); May 22, 1996 Trial Tr. at 15–16 (Boss cross).

The "Macke" patent, U.S. Patent No. 3,938,799, which issued on February 17, 1976, discloses an inserting machine for assembling individual folded sheets in which, on a fin shaped like a partial "W", one can assemble sheets in a side-by-side relationship between two fins, as in figure 3C of the patent, or gather them inside-to-outside on top of one of the fins, as in figure 4C of the patent. Pl.'s Ex. 71. Macke suggests to those skilled in the art to gather signatures on top of the fins in a machine such as the invention described in Reist. Pl.'s Ex. 389. It also shows that for inside-to-outside magazine assembly, an accumulation of sheets in a rotary drum may be placed so that the folded edge of each sheet is astride the fin instead of in a pocket between fins, and each sheet rests fold up with its open ends at the bottom of adjacent pockets. Therefore, when Reist discussed the inside-to-outside assembly as one of its modifications, it suggested a combination of Reist and Macke.

Ferag's "Meier '755" patent, U.S. Patent No. 4,408,755, which issued on October 11, 1983, discloses a rotary drum gatherer-stitcher that operates on a continuous web of paper, as distinguished from individual sheets. *See Ferag AG v. Grapha–Holding AG,* 905 F.Supp. 1 (D.D.C.1995). This patent reinforces the teaching of Reist: a rotating drum used in newspaper assembly in which there was no stitching can be used as a gatherer-stitcher for assembling magazines. By itself, the Meier '755 patent teaches that a plurality of saddle-stitcher carriers mounted in drum-like fashion and rotated about a common axis, with a complementary rotating drum stitching mechanism for stapling sheet assemblies on the drum after gathering, can convert an inserter into a gatherer-stitcher.

The obviousness of the machine claimed by the Weber patent is buttressed by Ferag's demonstration of the level of ordinary skill in the art. The parties have stipulated that the level of ordinary skill in the art at the time Weber made his invention was that of a "person skilled in mechanical engineering by education or training, with 10 or more years of experience in designing and building newspaper and/or magazine sheet assembly equipment." Stip. Fact. ¶ 55. To a person of ordinary skill in the art, the Reist inserter suggested the use of multiple saddles arranged in drum-like fashion and adapted to act as a gathering machine. Indeed, Ferag's witness George Higgins, a persuasive example of a person of ordinary skill in the art, reached this conclusion when he inspected the Springfield, Illinois, Reist inserter in the early 1980s. May 16, 1996 Trial Tr. at 260 (Higgins direct). Kenneth Field, the chief executive officer of a commercial printer, who has over 20 years of experience in the bindery industry, stated his understanding of the rotary drum gatherer-stitcher to be that the inserter "had just been turned around. Instead of inserting, [Ferag was] using it as

a collator, as a gatherer on this drum...." Pl.'s Ex. 395 (Field dep. at 18) (designated by both parties).

In addition, three individuals independently conceived of the Weber patented device prior to Weber's conception of it in 1984. *See supra* at 1242–1243. Although their work does not constitute "prior art," these contemporaneous suggestions—the Boss, Muller, and Hansch sketches and engineering notebook pages—provide cumulative evidence probative of the level of knowledge in the art at the time the Weber idea was disclosed, unembellished by hindsight. *See In re Merck & Co., Inc.,* 800 F.2d 1091, 1098 (Fed.Cir.1986); *Vandenberg v. Dairy Equipment Co.,* 740 F.2d 1560, 1567–68 (Fed.Cir. 1984). Such sketches confirm a core point: it would have been obvious to one of ordinary skill in the art at that time to use the Reist rotary drum as a gatherer-inserter for individual sheets. *See* Pl.'s Ex. 391 (tabs 3–15) (Muller drawings); Pl.'s Ex. 392 (Hansch drawings); Pl.'s Exs. 23, 33 (Boss drawings).

Finally, in resolving the question of obviousness, there remains for consideration the objective indicia of non-obviousness. *See Graham v. John Deere Co.,* 383 U.S. 1, 17, 86 S.Ct. 684, 693–94, 15 L.Ed.2d 545 (1966). These are the "secondary considerations" which "give light to the circumstances surrounding the origin of the [patented] subject matter," such as the commercial success of the patented invention, the long-felt need in the industry for a successful rotary gatherer-stitcher, and the attempts and failures by others to design such rotary gatherer-stitcher. *See Cable Elec. Products, Inc. v. Genmark, Inc.,* 770 F.2d 1015, 1026 (Fed.Cir. 1985). These "objective factors" provide "real world experience" of how the market viewed the patented device. *Rosemount, Inc. v. Beckman Instruments, Inc.,* 727 F.2d 1540, 1546 (Fed.Cir.1984). A product's commercial success would corroborate a finding of nonobviousness, and vice versa. For evidence about objective considerations to be given substantial weight, a "nexus between the merits of the claimed invention and the evidence of secondary considerations is required...." *Cable Elec. Products, Inc.,* 770 F.2d at 1026.

Commercial success is defined by a number of factors considered together: namely, number of units sold, market share, growth in market share, replacing earlier units sold by others or of dollar amounts, and evidence of a nexus between the sales and the merits of the invention. *See Kansas Jack, Inc. v. Kuhn,* 719 F.2d 1144, 1151 (Fed.Cir.1983). On the "totality of the evidence," I do not find that "commercial success" requires a holding that the Weber patent would have been nonobvious at the time it was invented to one skilled in the art. Grapha contends that Ferag's marketing materials, in which Ferag states that the IPEX machine is "the first breakthrough in stitching operation in 40 years," constitutes evidence of commercial success. However, marketing or advertising is not a factor of commercial success as defined by the Federal Circuit in *Kansas Jack.* Moreover, even if it were, that Grapha has not manufactured any machine covered by any claim of the Weber patent undercuts its assertion that Ferag's IPEX machine is a commercial success: it is reasonable to infer that if the rotary drum gatherer-stitcher were a commercial success, Grapha would attempt to enter that market by manufacturing its own rotary drum gatherer-stitcher. And indeed, the six IPEX machines, all sold in the U.S., are the only evidence of commercial success (compared with the 60 Reist machines and unnumbered in-line devices sold and operating). There is no evidence of market share, of growth in market share, or of replacing earlier units sold by others or of dollar amounts. The IPEX machine's relative lack of commercial success buttresses the finding that the Weber patent is obvious, just as the Reist inserter's commercial success only reinforces that it was, indeed, a groundbreaking and revolutionary advance in the bindery industry.

Furthermore, the sales of Ferag's rotary drum gatherer-stitcher are due, in part, to a feature not claimed in the Weber patent, and therefore, the nexus between the sales and claimed merits of the invention is considerably weak. Kenneth Field, the chief executive officer of a commercial printing company, stated that he decided to purchase the

IPEX machine because it wasted no product. During a four-hour demonstration, the machine never stopped because it has the "intelligence" to recognize a "bad signature" and reject it quickly. *See* Pl.'s Ex. 365 (Field dep. at 19). The Weber patent neither claims nor suggests a manner in which the integrity of the accumulation of sheets can be consistently monitored.

Grapha also contends that the Weber patent solved a long-felt need in the industry. However, even though there was always a need for more productive bindery equipment, Grapha's own witness, Heinz Boss, testified that it did not pursue manufacturing and commercializing the Weber patent because the market was not ready for such a machine. May 22, 1996 Trial Tr. at 38 (Boss cross). Grapha also contends that Ferag's development of the rotary drum gatherer-stitcher from 1982 to 1990 shows prior attempts and failures of others. However, Ferag has established that its activity was intermittent because of company demands for development of other products. *See* May 16, 1996 Trial Tr. at 203 (Hansch cross). The interrupted development by Ferag's engineers actually reinforces the finding that there was no significant need for a rotary drum gatherer-stitcher machine; and in fact, there was a two-year hiatus in the design history of a rotary drum gatherer-stitcher by both Ferag and Grapha.

The foregoing considered, I find and conclude that on the basis of the obviousness, claim 1 of the Weber patent is invalid.

### C.

Grapha's Weber patent is also invalid because it does not enable one skilled in the art to make and use the embodiments of the patent depicted in figure 1 or in figures 2–4. At the time the application is filed, the patent specification must "contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art ... to make and use the same." 35 U.S.C. § 112. To be enabling under § 112, the patent specification must teach those skilled in the art how to make and use the full scope of the

claimed invention without "undue experimentation." *In re Wright,* 999 F.2d 1557, 1561 (Fed.Cir.1993); *see Hybritech Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367, 1384 (Fed.Cir.1986), *cert. denied,* 480 U.S. 947, 107 S.Ct. 1606, 94 L.Ed.2d 792 (1987). Factors to be considered in determining whether a disclosure would require undue experimentation include, among other things: (1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, and (6) the relative skill of those in that art. *In re Wands,* 858 F.2d 731, 737 (Fed.Cir.1988).

The embodiments of figures 1 and 2–4 of the Weber patent are nonfunctional as disclosed because one skilled in the art could not get the sheet on the carrier and between the carriers and the guides. Ferag presented the clear and convincing testimony of its independent witness, George Higgins, who stated that the sheet feeding units disclosed in the Weber patent are inherently incapable of opening and inserting sheets between the guides bracketing the carriers, whether the carriers are rotating past the feed units or are stationary. *See* Pl.'s Ex. 389 at 34–36 (Higgins stmt.). As Ferag argued, that is because, as seen in Grapha's U.S. Patent No. 3,199,862, which is cited in the patent as exemplary, the panel edges of the folded sheets are pulled far apart before the sheet is released onto a stationary carrier. In order for the feeding units properly to insert the sheets between the guides, the guides would necessarily be so far apart as to be worthless for their intended purpose, i.e., to "confine the panel of folded sheets 5" so as "to prevent uncontrolled further spreading or opening ..." of the sheets. *See* Weber patent, col. 5, ll. 6–14. Furthermore, if the carriers and guides are rotating past the feeding units, the feeding units could not properly insert sheets in between the carriers and the guides. As Higgins convincingly demonstrated, the signature would "have to get inside of here somehow [a narrow space between the fin and the guide] and then fall down over that fin. It simply can't be done."

May 15, 1996 Trial Tr. at 250 (Higgins direct).

Grapha's expert witness on engineering, Gary Gabriele, outlined an approach suggesting how the figure 1 embodiment illustrated in the Weber patent could be made to work provided a number of modifications are made. However, even if, with these modifications, a functional machine could be realized, it would take a skilled engineer in the bindery industry four to six years to carry out Dr. Gabriele's approach. May 16, 1996 Trial Tr. at 256 (Higgins direct). The years of effort required to discover how to make and use the alleged Weber invention constitutes more than routine or ordinary effort. *See White Consol. Indus., Inc. v. Vega Servo-Control, Inc.*, 713 F.2d 788, 791 (Fed.Cir. 1983) (finding 1½ to 2 man years to develop the invention unreasonable). Given the lack of guidance and direction provided by the specification and the quantity of experimentation required, the Weber patent requires "undue experimentation" to practice the invention and therefore is nonenabling under 35 U.S.C. § 112.

The fact that defendant has not made a machine covered by any claim of the Weber patent corroborates this finding. If the patent did disclose an enabling device, and if, as defendant contends, there currently exists a market for the high-speed rotary drum gatherer-stitcher, defendant's failure to make such a machine leads to the reasonable inference that the patent does not disclose, in "full, clear, concise, and exact terms," the information as "to enable any person skilled in the art ... to make and use the same."

## IV.

### A.

■ As the Federal Circuit has noted, "when presented with patent validity and infringement issues, trial courts should ... decide both." *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1540 (Fed.Cir.1983). Therefore, although as a matter of law there can be no infringement of an invalid claim, and Section III of this Memorandum holds that claim 1 of Grapha's Weber patent *is* invalid, the infringement issue must be addressed. The difference between the two issues may be stated succinctly: resolving invalidity on the basis of obviousness requires comparing the Weber patent with the prior art; whereas resolving infringement requires comparing the Weber patent with subsequent developments. Treating the Weber patent as valid for purposes of infringement analysis only, I find and conclude that Ferag's IPEX machine does not infringe the patent.

■ As the patentee, Grapha has the burden of proving by a preponderance of the evidence that the accused devices embodies every element of the claim as properly construed, either literally or by operation of the doctrine of equivalents. Absence of any "element" or "limitation" (the terms are essentially synonymous) requires a finding of noninfringement. *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1389 (Fed.Cir.1992) ("As this court has *repeatedly* stated, infringement requires that *every limitation* of a claim be met literally or by a substantial equivalent.") (emphasis in original). Under the doctrine of equivalents, "infringement may be found ... if an accused device performs substantially the same overall function or work, in substantially the same way, to obtain substantially the same overall result as the claimed invention." *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 607–08, 70 S.Ct. 854, 855–56, 94 L.Ed. 1097 (1950). However, an accused device's performance of the same function "will not make [it] an infringement under the doctrine of equivalents where it performs the function and *achieves the result in a substantially different way.*" *Perkin–Elmer Corp. v. Westinghouse Elec. Corp.*, 822 F.2d 1528, 1531 n. 6 (Fed.Cir.1987) (emphasis added). As the Federal Circuit recently observed, "the doctrine of equivalents is the exception, however, not the rule, for if the public comes to believe (or fear) that the language of patent claims can never be relied on, and that the doctrine of equivalents is simply the second prong of every infringement charge, regularly available to extend protection beyond the scope of the claims, then claims will cease to serve their intended purpose." *Lon-*

**1250**

*don v. Carson Pirie Scott & Co.*, 946 F.2d 1534, 1538 (Fed.Cir.1991).

■ Analysis of a patent infringement claim entails two inquiries: first, the legal interpretation of the scope of the claims; and second, the factual finding of whether the properly construed claims encompass the accused structure. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed.Cir. 1995), *aff'd*, —— U.S. ——, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). The issue of infringement in this case centers on claim 1, which is the Weber patent's only independent claim. To avoid infringement, Ferag need show only the noninfringement of independent claim 1 because a dependent claim cannot be infringed unless the accused device is also covered by the related independent claim. *See Wolverine World Wide, Inc. v. Nike, Inc.*, 38 F.3d 1192, 1199 (Fed.Cir.1994). Weber's claim 1 describes as an invention:

> A machine for accumulating folded sheets into brochures and like products, comprising: a sheet transporting device arranged to advance sheets having folded backs in a predetermined direction along a predetermined path and including at least two elongated parallel carriers and discrete conveyor means for each of said carriers, each of said conveyor means having means for advancing sheets along the respective carrier; and means for feeding sheets to said carriers so that the backs of the sheets straddle the respective carriers, comprising a first feeding unit having means for depositing first sheets onto successive carriers in a first portion of said path and at least one additional feeding unit having means for depositing second sheets over successive first sheets in a second portion of said path downstream of the first portion so that the backs of the second sheets straddle the backs of the respective first sheets and form therewith accumulations of the first and second sheets wherein the backs of the second sheets are accessible. Col. 9, ll. 31–49.

The parties agree that the following elements of Weber's claim 1 are in dispute: (1) the "sheet transporting device ... to advance sheets ... (2) in a predetermined direction along a predetermined path; (3) "means for

feeding sheets"; (4) "discrete conveyor means"; and (5) "means for advancing sheets". *See* Pl.'s Concl. of Law at ¶¶ 19–26; Def.'s Concl. of Law at ¶¶ 48–77. Of these five disputed elements in the Weber patent, only one of the five is offended by the Ferag products. As the Federal Circuit has repeatedly held that infringement requires that every limitation of a claim be met literally or by a substantial equivalent, and because the other four disputed elements or limitations in the Weber patent are either not performed by or not incorporated in the structure of the Ferag products at issue here, the Ferag rotary drum gatherer-stitchers do not infringe the Weber patent. *See Intellicall, Inc.*, 952 F.2d at 1388–89.

**B.**

Claim 1 of the Weber patent discloses a "*sheet transporting device* arranged to advance sheets having folded backs in a predetermined direction along a predetermined path and including at least two elongated parallel carriers and discrete conveyor means for each of said carriers, each of said conveyors having means for advancing sheets along the respective carrier...." Ferag contends that the "sheet transporting device" should be construed as having six elements: a shaft, a hub, carriers, plate-like guides, chain conveyors, and pushers. These are the elements numbered 1 to 6 in figure 1 of the patent. Ferag states that this construction finds support in the Weber patent specification, which in the "description of the preferred embodiments" refers to "sheet transporting device" as follows: "The guides 4, chain conveyors and pushers (not specifically shown) are identical with or analogous to the parts 4, 5 and 6 of the *sheet transporting device 1–6* in the machine of FIG. 1." *See* Weber patent, col. 7, ll. 13–15 (emphasis added). To buttress this interpretation, Ferag refers to the prosecution history of the Weber patent, in which the attorney prosecuting the Weber patent application before the U.S. Patent and Trademark Office referred to the sheet transporting device "as the device 1–6 of Fig. 1." Pl.'s Ex. 2 at 77.

In construing the specific language of a claim, "[w]ords ... 'will be given their ordi-

nary ... meaning, unless it appears that the inventor used them differently.' " *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 759 (Fed.Cir.1984). "[C]laims are not to be interpreted by adding limitations appearing only in the specification.... [A]lthough the specification may well indicate that certain embodiments are preferred, particular embodiments appearing in a specification will not be read into the claims when the claim language is broader than such embodiments." *Electro Medical Systems, S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1054 (Fed.Cir. 1994).

Ferag's proposed interpretation of "sheet transporting device" fails to overcome the clear language in the claim as to the meaning of the term. The language in the specification and the reference in the prosecution history describing the sheet transporting device as including elements "1–6" simply describe two embodiments of the claimed invention, i.e., that shown in figure 1, and that shown in figures 2 to 4. These references do not control the meaning of "sheet transporting device," which is defined in the claim: it covers a drum and "includes at least two elongated parallel carriers, each carrier having discrete conveyor means." Ferag's proposed interpretation would violate the rule that particular embodiments appearing in a specification should not be read into the claims when the claim language is broader than such embodiments, and it would also violate the rule of claim construction prohibiting "double inclusion." *Ex parte Kristensen*, 10 U.S.P.Q.2d 1701, 1703 (Bd. Pat. Appeals 1989). If "sheet transporting device" is interpreted as proposed by Ferag, that is, as including elements 1 to 6 described in the specification—shaft, hub, carriers, guides, endless chain conveyors, and pushers—then the subsequent language in claim 1 defining the elements of the sheet transporting device as including carriers, conveyors, and advancing means would be "doubly included" and superfluous.

As interpreted, the "sheet transporting device" element of claim 1 literally reads onto Ferag's IPEX machine because Ferag's IPEX machine has a drum and "at least two elongated parallel carriers, each carrier having discrete conveyor means."

## C.

The clause of claim 1 set forth above also requires that each deposited sheet move in a "predetermined direction along a predetermined path." Weber patent, col. 9, ll. 34–35. Grapha asserts that this phrase means only that the sheets must travel on the drum axially from one end to the other along a "non-random" path, and that the plain meaning of this language does not require that the path be helical. A "non-random" path ensures that each sheet will be properly positioned with respect to subsequent sheet feeding units or other elements of the machine, and arrives at the proper time and in the proper alignment. Hence, the path may be, but is not required to be, helical.

Ferag reads this language in the Weber patent as requiring a helical path because the only path described in the Weber patent is a helical path, and in fact, no other path could be created because in the Weber machine, there is constant axial and rotational movement. Ferag points out that the patent specification states, "a sheet transporting device which serves to advance folded sheets in a predetermined direction (preferably along a helical path)" and further states, "moving the sheets on the carriers in parallelism with the axis so that the sheets advance along the aforementioned helical path." Weber patent, col. 3, ll. 11–14, 48–50.

Grapha responds that Ferag's reading violates the doctrine of claim differentiation, which requires that claims should be presumed to cover different inventions. Claim 20 of the Weber patent claims "[t]he machine of claim 1, wherein said path is a helical path." Because Claim 20 claims a "helical path," the "predetermined path" in Claim 1 cannot mean "helical": " '[A]n interpretation of a claim should be avoided if it would make the claim read like another one.' " *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1538 (Fed.Cir.1991).

The doctrine of claim differentiation is not a hard and fast rule, however; indeed, " '[i]f a claim will bear only one interpretation, similarity will have to be tolerated.' " *Id.* In

the Weber patent, a "helical" path is the only interpretation the element "predetermined path" can bear. The Weber patent teaches against changing the direction of the sheets, and therefore, requires a continuous rotational and axial movement, which results in a helical path. Although the patent does state that a helical path is "preferable," there is no other path that could be created by application of the Weber patent.

As interpreted, this element does not read onto the IPEX machine either literally or under the doctrine of equivalents. Ferag's IPEX machine moves sheets in a stepwise fashion, not helical. The axial motion of the sheets is not continuous in the IPEX machine. Indeed, during 75% of a revolution, the sheets do not move axially, only circularly. Axial and circular motion occur together in less than 25% of a revolution, which creates only a small section of a helix. May 15, 1996 Trial Tr. at 48 (Felix direct). Therefore, there is no literal infringement.

Even under the doctrine of equivalents, there is no infringement because there are substantial differences between a stepwise path and a helical path. Principally, the stepwise path allows for the alignment of sheets because the absence of continuous axial movement permits the operator of the IPEX machine to monitor the quality of the gathered product. One of the major advantages of the IPEX machine is its ability to monitor product integrity throughout the binding process. *See* Pl.'s Ex. 395 (Field dep. at 20–21). Furthermore, the stepwise path avoids the problem of having axial movement on the bottom side of the drum, where the sheet would rub against the belts. Therefore, Grapha's helical path and Ferag's stepwise path are substantially different in manner and in result.

### D.

■ Claim 1 also requires that each carrier include "discrete conveyor means." When a claim element is expressed as a means or step for performing a specified function without the recital of structure, material, acts, or acts in support thereof, the element is interpreted pursuant to 35 U.S.C. § 112, ¶ 6. This paragraph states that a means-plus-function clause covers the structure disclosed in the patent and any equivalent of the structure which is described in the patent specification as performing that function. *Valmont Indus., Inc. v. Reinke Mfg. Co.*, 983 F.2d 1039, 1043 (Fed.Cir.1993). For a means-plus-function limitation to read literally onto Ferag's accused devices, the accused device must (1) employ means identical or equivalent to the structure, material, or acts described in the Weber patent specification, and (2) perform the identical function specified in the asserted claims. *King Instruments Corp. v. Perego*, 65 F.3d 941, 945–46 (Fed.Cir.1995), *cert. denied,* — U.S. —, 116 S.Ct. 1675, 134 L.Ed.2d 778 (1996).

The structure in the Weber specification for performing the "discrete conveying means" function (conveying each sheet along the carrier) is the "discrete endless chain conveyor" numbered 5 in figure 1 of the patent. Weber patent, col. 5, ll. 15–16. This chain conveyor is similar to the sprockets and chains used on a bicycle and is located inside the carrier. In order to maintain the helical movement of the sheets, the chain must move continuously along the axis of the drum. The chain cannot stop and restart or reverse directions. Each carrier has its own separate and discrete chain conveyor, and each chain conveyor operates with pushers which advance deposited sheets in a predetermined direction.

Unlike the Weber patent's chain conveyor, Ferag's IPEX machine does not use a chain conveyor, but rather conveys sheets by a reciprocating control slide. The control slide is a piece of metal that rides on the side of the fins of the drum. As the drum rotates, the control slide starts, pauses, and reverses axial direction movement, whereas the chain conveyor continuously moves axially without stopping or reversing direction. Given these differences, the control slide is not "identical" to the chain conveyor. Nevertheless, there can be literal infringement of the means-plus-function clause if there is an "equivalent" to the chain conveyor in the IPEX machine. In the context of section 112, "an equivalent results from an insubstantial change which adds nothing of significance to the structure, material, or acts disclosed in ·

the patent specification." *Valmont Indus., Inc.,* 983 F.2d at 1043.

The IPEX machine's control slide is not the mechanical equivalent of the Weber patent's chain conveyor; nor under the doctrine of equivalents is the IPEX machine's control slide substantially similar in manner to Weber's chain conveyor. The chain conveyor moves continuously without stopping or reversing direction, which allows for no time in which the product can be properly aligned and the integrity of the product checked. In contrast, the control slide starts, pauses, and reverses axial movement, which creates time to align the product and to monitor the product's integrity. Moreover, this movement also enables the IPEX machine to move sheets into and out of the stitching station, in which time is needed for stapling, because the axial movement is not constant. Weber's chain conveyor cannot achieve these advantages.

### E.

Claim 1 further requires that "each of said conveyor means hav[e] *means for advancing sheets* along the respective carrier." (emphasis added). Each conveyor includes a series of pushers such as pins, blocks, or other suitable means for advancing sheets along a respective carrier. These are defined in the specification as pins located at the top of the carrier, number 6 in figure 1 of the patent. Each pin touches a collection of sheets and actually pushes them along the length of the carrier in a helical path until the sheets reach the stapler, at which point the pin rotates down and returns to the beginning of the carrier. Because the pins are continuously moving, they cannot travel into or beyond the stapler. The patent states that "the pushers [ ] are designed to advance sheets [ ] all the way to but not beyond the [stapling] station," Weber patent, col. 8, ll. 32–34; and figure 1 shows that the pushers travel along paths which terminate at the stapling station. The pushers are the only structure disclosed as an advancing means in Weber.

For a means-plus-function limitation to read literally onto Ferag's accused devices, the accused device must (1) employ means identical or equivalent to the structure, material, or acts described in the Weber patent specification, and (2) perform the identical function specified in the asserted claims. *King Instruments Corp. v. Perego,* 65 F.3d 941, 945–46 (Fed.Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1675, 134 L.Ed.2d 778 (1996). Ferag's IPEX machine does not employ "means identical or equivalent to the structure, material, or acts described in the Weber patent specification." The IPEX machine does not have such pushers but rather, reciprocating wedges, which are only on one side of the fin, move back and forth, and do not travel the entire length of the machine. May 15, 1996 Trial Tr. at 50 (Felix direct). They drive a sheet for approximately one-fourth of a revolution and do not travel from one feeder to the next. In comparison, a pin on the Weber patent moves with the sheet or collection of sheets down the length of the entire carrier. With the IPEX machine, to advance a sheet from one feeder to the next or from the feeder to the stapler takes two different wedges and two drum revolutions. Hence, there is no identity or equivalence between the pushers of the Weber patent and the reciprocating wedges of the IPEX machine.

There is also no infringement under the doctrine of equivalents because the IPEX machine's wedges operate in a manner and obtain results substantially different from the manner and results that would attend the Weber pushers. On the IPEX machine, as the sheets move along the fin, a different wedge moves the sheet through each section of the machine and consequently beyond the stapler. A wedge goes into the stapler and another wedge goes beyond the stapler. This structure accomplishes a number of results not obtained in the Weber patent: first, because the wedges do not continuously move axially, there is no axial movement when the stapling takes place; second, the wedges are able to move axially after stapling, which allows the IPEX machine to have an exit station that is axially after the stapling section. There is no such exit station in the Weber patent. Indeed, if the Weber pushers moved into the staple section, the machine could not operate.

### F.

Claim 1 of the Weber patent requires "means for feeding sheets to said carriers ..., comprising a first feeding unit having means for depositing first sheets onto successive carriers in a first portion of said path." Weber patent, col. 9, ll. 39–40. Because this is a means-plus-function clause, one must go to the specification to determine what the claimed "means" are and their equivalents. Weber has two different means for feeding sheets. The first feeding means, shown in figure 1, uses conventional drum feeders, such as that disclosed in the Muller '862 patent, U.S. Patent No. 3,199,862. The second, shown in figure 3, has a ring of pockets with opening devices that rotate around the same axis as the drum. These are the only opening means disclosed in the Weber.

The conventional drum feeder means is identified by number 7 or 8 in figure 1 of the Weber patent. Known in the bindery industry since the 1930s, these feeders use rotating drums to withdraw sheets from a stack. One of the drums grabs the sheet, takes it from the stack, and rotates it around until the grippers on the other drums grab it and change its direction. These grippers drop the sheets onto the carrier. These openers and depositors do not move with the rotating carriers and do not rotate around the axis of the drum. *See* May 30, 1996 Trial Tr. at 59 (Gabriele cross). Figure 3 of the Weber patent discloses a different feeding means. Here, sheets move into a rotating pocket; the openers rotate around the axis of the drum; and the sheets are pinched and then thrust onto a carrier. Each carrier has its own opening and depositing means which travel along the axis of the carrier.

Ferag's IPEX machine does not use a drum feeder as shown in figure 1 of the Weber patent nor a mechanical equivalent to a drum feeder. Rather, IPEX uses gripper conveyors, a star wheel opener, and a feeder screw to position the sheets in the path of the fin on the drum. *See* Pl.'s Exs. 362, 363, 425. In the IPEX feeding mechanism, one gripper conveyor carries a single sheet to the star wheel. This is essentially the same type of feeding mechanism Ferag uses for its commercial inserter. At the star wheel, the longer edge of the sheet is pushed into an open clamp, which then closes. A finger on the star wheel, called the "unpeeler", opens the sheets. Once the sheet is opened, the feeder screw and the gripper conveyor move the opened sheet towards the drum. The fin rotates into the opened sheet, and the gripper then releases it. Unlike the feeding means disclosed in figure 1, the IPEX feeding mechanism is a fluid, smooth, continuous motion, and the sheets do not stop or start or change directions. Also, the fin touches the open sheet while the sheet is still controlled by the gripper conveyor, thereby greatly increasing sheet control and production rates. Hence, the IPEX machine does not employ means identical or equivalent to the structure, material, or acts described in figure 1 of the Weber patent specification, nor does the IPEX machine's feeding mechanism operate in substantially the same way as does the means described in figure 1.

Weber's figure 3 embodiment of the feeding means rotates around the drum and along the length of the drum. *See* May 30, 1996 Trial Tr. at 60 (Gabriele cross). Accordingly, for there to be identity or equivalence between the figure 3 embodiment and the IPEX machine, the IPEX machine must also have a device for depositing sheets which moves along the length of the drum with the carriers. The means on the IPEX machine do not move along the length of the drum with the carriers; hence, there is no literal infringement. Moreover, under the doctrine of equivalents, substantial differences exist between how the product is gripped and opened in the respective machines. The IPEX machine grips the signature by the folded edge so the fin can enter the opened signature. The feeding means in Weber's figure 3 grips the signature by the cut edge. Furthermore, Grapha's witness acknowledged that the opener in the IPEX machine does not work similarly to the way in which the openers in figure 3 work; Grapha's witness also testified that one of ordinary skill in the art would not think to substitute the opener in the IPEX machine for the opener of figure 3. May 30, 1996 Trial Tr. at 69–70 (Mayer direct). Accordingly, there is no infringement under the

doctrine of equivalents of the means for feeding sheets element in the Weber patent.

### G.

Because infringement requires that the accused device embody every element of the claim as properly construed, either literally or under the doctrine of equivalents, and because the IPEX machine does not embody the "predetermined direction in a predetermined path" element, the "discrete conveyor means" element, the "means for advancing sheets" element, and the "means for feeding sheets" element, the IPEX machine does not infringe claim 1 of the Weber patent.

### V.

An accompanying Order grants judgment to Ferag that Grapha's patent-in-suit is invalid and unenforceable, and that the patent-in-suit is not infringed by Ferag.

### *ORDER*

For the reasons stated in the accompanying Memorandum, it is this 22 day of July 1996 hereby

DECLARED: that defendant's patent-in-suit is invalid and unenforceable; and it is further

DECLARED: that plaintiffs' rotary drum gatherer-stitchers would not infringe defendant's patent-in-suit if it were valid; and it is further

ORDERED: that, on plaintiffs' complaint and defendant's counterclaim, JUDGMENTS shall be entered for PLAINTIFFS and against DEFENDANT.

1256

APPENDIX A

# United States Patent [19]

## Weber

[11] Patent Number: 4,735,406

[45] Date of Patent: Apr. 5, 1988

[54] MACHINE FOR MAKING BROCHURES AND THE LIKE

[75] Inventor: Walter Weber, Brittnau, Switzerland

[73] Assignee: Grapha-Holding AG, Hergiswil, Switzerland

[21] Appl. No.: 868,261

[22] Filed: May 28, 1984

[30]     Foreign Application Priority Data

Jun. 4, 1985 [CH] Switzerland .................... 02354/85

[51] Int. Cl.⁴ ................................................. B42B 1/02

[52] U.S. Cl. ......................................... 270/53; 54/58

[58] Field of Search ..................................... 270/53–58, 270/37; 227/99–106, 39–40, 41, 46, 49–50

[56]             References Cited

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 389,147 | 9/1888 | Heyl | 270/37 |
| 1,791,081 | 2/1931 | Seiter | 270/53 |
| 3,799,862 | 8/1965 | Muller | 270/54 |
| 3,951,399 | 4/1976 | Reist | 270/58 |
| 4,041,883 | 8/1977 | Meratti et al. | 270/53 |
| 4,079,928 | 3/1978 | Weschenfelder et al. | 270/55 |
| 4,080,678 | 3/1978 | Muller | 270/53 |
| 4,085,927 | 4/1978 | Muller | 270/54 |
| 4,116,427 | 9/1978 | Muller | 270/54 |
| 4,124,203 | 11/1978 | Muller | 270/55 |
| 4,133,521 | 1/1979 | Muller | 270/55 |
| 4,299,378 | 11/1981 | Muller | 270/54 |
| 4,350,327 | 9/1982 | Muller | 270/54 |

| | | | |
|---|---|---|---|
| 4,491,311 | 1/1985 | Glanzmann | 270/54 |
| 4,511,132 | 4/1985 | Muller | 270/58 |
| 4,519,599 | 5/1985 | Mayer | 270/53 |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 95603 | 12/1983 | European Pat. Off. . | |
| 2631058 | 1/1978 | Fed. Rep. of Germany . | |
| 660854 | 5/1979 | U.S.S.R. | 270/37 |

Primary Examiner—E. H. Eickholt
Attorney, Agent, or Firm—Peter K. Kontler

[57]             ABSTRACT

A machine for accumulating folded sheets into brochures wherein the sheets are stapled to each other along fold lines has a rotary transporting device with several axially parallel saddle-like carriers for opened sheets and pushers which advance the sheets along their carriers into the range of a stapling device. The sheets are fed to the carriers at two or more stations which are spaced apart from one another in the axial direction of the transporting device and open the sheets shortly before the sheets reach the respective carriers so that each sheet which is deposited at the first station directly straddles its carrier and each sheet which is deposited at a next station directly straddles the previously deposited sheet. the stapling device has several stapling units which perform a pendulum movement about the axis of the transporting device and are operated to simultaneously apply staples to two or more brochures.

27 Claims, 4 Drawing Sheets

PLAINTIFF'S
EXHIBIT
1A

PLAINTIFF'S DEPOSITION
EXHIBIT
1A

Fig. 1

Fig. 2

Fig. 3

Fig. 4

4,735,406

# MACHINE FOR MAKING BROCHURES AND THE LIKE

## BACKGROUND OF THE INVENTION

The invention relates to machines for making brochures and like accumulations of folded sheets. Machines to which the present invention pertains include those known as gather-stitchers wherein one or more staples are used to connect the backs of accumulated folded sheets to each other.

Presently known gather-stitchers operate with drum-shaped singularizing devices which remove successive sheets from a stack by grasping the folded backs of individual sheets. The backs of the withdrawn sheets are caused to strike an abutment, and the thus oriented sheets are opened up by pairs of drums which engage the front edges of the sheets and accelerate the opened sheets on their way toward a saddle-like chain conveyor or a saddle-like rail whereon the opened sheets are transported past one or more additional sheet-admitting stations and on to a stapling station. The accumulations of stapled-together sheets are ejected from the machine by moving them transversely of the direction of travel along the conveyor or along the rail and by depositing them on one or more belt conveyors.

A drawback of conventional gather-stichers and similar machines is that their output is limited because each and every sheet must be individually transported through the machine so that a higher output can be achieved only by increasing the speed of individual sheets. Moreover, only a fraction of a machine cycle is available for the treatment of sheets, such as opening, stapling and ejecting. The speed of individual sheets cannot be increased at will, especially since each sheet is caused to abruptly change the direction of its movement as soon as it reaches the conveyor or the rail as well as immediately upon completion of the stapling operation. Even the most recent types of presently known gather-stitchers cannot turn out in excess of five brochures or the like per second.

Attempts to increase the output of conventional gather-stitchers and analogous machines include reducing the number of changes in the direction of movement of individual sheets. Reference may be had to German Offenlegungsschrift No. 26 31 058. However, the machine of this German printed publication still exhibits a number of drawbacks, such as the need to completely singularize each and every stack of folded sheets (so that a high output can be achieved only by increasing the speed of advancement of sheets from the feeding stations to the stapling station) as well as the fact that only a small fraction of the machine cycle is available for the application of one or more staples to an accumulation of sheets. Still further, the machine which is disclosed in the German printed publication relies on opening of folded sheets exclusively under the action of gravity and centrifugal force. Such mode of opening is not sifficiently reliable because electrostatically charged sheets or sheets whose folded-over panels adhere to each other under the action of freshly applied printing ink are not likely to be opened up with a required degree of predictability. Therefore, the output of such machines is still below that which is desirable in a modern paper processing plant.

Published European patent application No. 95 603 discloses a machine which is similar to that of the aforediscussed German printed publication except that the saddles resemble the rungs of ladders and are closely adjacent to each other. Even though the panels of opened sheets extend downwardly beyond the saddles, the European application does not disclose any means for stabilizing the downwardly extending panels at elevated speeds of the sheets and/or the manner of stapling the accumulated sheets to each other. As a rule, a reliable stapling operation necessitates the utilization of clinching devices which must be guided with a high degree of accuracy in order to cooperate with the staple applying devices so as to predictably deform the legs of staples upon penetration of the legs through the accumulations of sheets at the stapling station. The downwardly extending panels are likely to flutter while the sheets advance at an elevated speed so that they do not permit for predictable introduction of clinching devices. The provision of clinching devices directly on the saddles would contribute to the initial and maintenance cost of the machine, and the clinching devices would have to be guided with a high degree of precision in order to properly register with the mobile staple applicators at the stapling station.

Swiss Pat. No. 584,153 discloses means for stuffing one or more inner sections into the jackets of newspapers or the like. The jackets are introduced into the pockets of a rotating wheel with their folded backs leading, and the jackets are thereupon moved in the axial direction of the wheel and are opened up to provide room for one or more inserts. Each jacket completes one revolution about the axis of the wheel and is opened up as well as shifted axially during such revolution. The patented machine has sheet opening means only between the jacket feeding and the insert admitting stations. The opening means of the patented machine are not suited for predictable opening of sheets, especially if each sheet is a composite sheet having first and second groups of panels joined to each other along the back of the composite sheet. Still further, the backs of folded sheets in the bottom portions of pockets in the rotating wheel are not accessible to stapling or other sheet connecting devices.

Additional sheet gathering machines are disclosed in commonly owned U.S. Pat. Nos. 4,080,678 and 4,511,132.

## OBJECTS AND SUMMARY OF THE INVENTION

An object of the invention is to provide a novel and improved gather-stitcher or an analogous machine whose output exceeds and can be a multiple of the output of a conventional machine.

Another object of the invention is to provide the machine with novel and improved means for manipulating the sheets of brochures and like accumulations of folded sheets on their way from the respective sources to a station where the sheets of an accumulation are stapled or otherwise connected to each other.

A further object of the invention is to provide the machine with novel and improved stapling means.

An additional object of the invention is to provide the machine with a novel and improved sheet transporting, opening and connecting arrangement.

Still another object of the invention is to provide a novel and improved method of transporting, opening, accumulating and connecting folded sheets on their way from discrete sources to the gathering station for finished brochures and like products.

A further object of the invention is to provide a machine wherein a large part of or an entire machine cycle is available for the application of staples or like fasteners.

Another object of the invention is to provide a machine whose output exceeds that of conventional machines even though the sheets need not be transported at an elevated speed such as could cause fluttering and/or other undesirable stray movements of the sheets.

The improved machine is used to accumulate folded sheets into brochures or like products and comprises a sheet transporting device which serves to advance folded sheets in a predetermined direction (preferably along a helical path) and comprises at least two elongated parallel saddle-like or otherwise configurated carriers and discrete conveyor means for each carrier. Each conveyor means comprises pushers or other suitable means for advancing sheets along the respective carrier, and the machine further comprises means for feeding sheets to the carriers so that the sheets straddle the respective carriers. The feeding means comprises a first feeding unit having means for depositing first sheets onto successive carriers in a first portion of the path, and at least one additional feeding unit having means for depositing second sheets over successive first sheets in a second portion of the path downstream of the first portion so that the second sheets straddle the respective first sheets and form therewith accumulations of first and second sheets. The machine further comprises means for connecting (for example, stapling) the sheets of the accumulations to each other in a third portion of the path downstream of the second portion. The depositing means of the feeding units preferably include means for cyclically supplying sheets into the respective portions of the path at predetermined intervals. The connecting means can comprise means for simultaneously stapling the sheets of a plurality of discrete accumulations to each other, i.e., the stapling of sheets which form a first accumulation can take place simultaneously with the stapling of sheets which form one or more additional accumulations. The stapling means can comprise means for applying a single staple or a plurality of staples to the sheets of each accumulation of first and second sheets.

The transporting device can comprise means for rotating the carriers about a predetermined axis (e.g., about a substantially horizontal axis) and for simultaneously moving the sheets on the carriers in parallelism with the axis so that the sheets advance along the aforementioned helical path. The carriers are preferably parallel to the axis. One or more shrouds and/or other suitable means can be provided to hold the sheets on the carriers against stray movements relative to the respective carriers under the action of gravity and/or centrifugal force. The holding means do not prevent those movements of the sheets (e.g., under the action of gravity) which are needed to open up the sheets and to thus enable the sheets to properly ride on the corresponding carriers.

The advancing means can be designed to deliver successive accumulations of sheets only into the third portion of the path, i.e., not beyond the third portion of the path. This can be achieved by properly selecting the paths of travel of the aforediscussed pushers of conveyors which cooperate with the carriers to move the sheets along the carriers from the first feeding unit, to each additional feeding unit and ultimately to the connecting means. The connecting means can comprise

two or more discrete staple applicators and means for imparting to the applicators a pendulum movement about the axis which is defined by the transporting device. Means can be provided to synchronously operate two or more staple applicators so that each applicator can apply at least one staple to a discrete accumulation of sheets simultaneously with another applicator.

The sheet feeding units can be provided with means for opening up successive sheets in the respective portions of the path, or with means for opening up the sheets before they reach the respective portions of the path. If the opening means are designed to open up the sheets in the respective portions of the path, each feeding unit can comprise a plurality (e.g., a complete annulus) of pockets, one for each carrier and each mounted for orbital movement about the axis in the respective portion of the path, and means for supplying folded sheets into successive pockets of the annulus. Such sheet feeding units further comprise discrete opening means for each pocket, and each discrete opening means can effect the transfer of sheets from the pockets to the respective carriers. The carriers can be mounted on a hub which forms part of the transporting device and rotates about the aforementioned axis. In accordance with a presently preferred embodiment of the invention, the carriers are equidistant from one another in the circumferential direction of the hub. Each pocket has a wide inlet which is remote from the axis and a narrower outlet which is nearer to the axis and is preferably adjacent the respective carrier. Such feeding units can comprise stationary cam means and the opening means can be provided with followers which track the respective cam means.

The connecting means can comprise at least one mobile staple applicator at one side of the third portion of the path and a mobile staple clinching device at the opposite side of the third portion of the path. Such connecting means can further comprise a stationary cam for the clinching device, and the latter is then provided with follower means to track the cam.

The novel features which are considered as characteristic of the invention are set forth in particular in the appended claims. The improved machine itself, however, both as to its construction and its mode of operation, together with additional features and advantages thereof, will be best understood upon perusal of the following detailed description of certain specific embodiments with reference to the accompanying drawing.

## BRIEF DESCRIPTION OF THE DRAWING

FIG. 1 is a schematic perspective view of a machine with three saddle-like carriers which embodies one form of the invention;

FIG. 2 is a side elevational view of a second machine;

FIG. 3 is a transverse sectional view as seen in the direction of arrows from the line III—III of FIG. 2; and

FIG. 4 is a transverse sectional view as seen in the direction of arrows from the line IV—IV of FIG. 2.

## DESCRIPTION OF THE PREFERRED EMBODIMENTS

FIG. 1 shows a machine wherein a transporting device includes a stationary horizontal shaft 1 for a rotary hub 2 which supports and rotates three equidistant axially parallel straight elongated saddle-like carriers 3. The means (e.g., a variable-speed electric motor) for rotating the hub 2 about the axis of the shaft 1 is not

specifically shown in the drawing. The machine operates cyclically in such a way that the hub 2 rotates through 120 degrees during each cycle, i.e., that the hub completes a full revolution while the machine completes three successive cycles.

The carriers 3 are flanked by pairs of plate-like guides 4 which can be made of sheet metal and confine the panels of folded sheets S which are manipulated in the machine while the sheets straddle the respective carriers 3 so that the folded back of each sheet is outwardly adjacent the ridge of the corresponding carrier 3. The guides 4 are designed to prevent uncontrolled further spreading or opening of sheets S which ride on the corresponding carriers 3.

Each carrier 3 cooperates with a discrete endless chain conveyor 5 having a series of equidistant advancing elements in the form of pushers 6 which serve to advance the sheets S along the respective carriers from a first station which is occupied by a first sheet feeding unit 7, toward, past and beyond a second station which is occupied by a second sheet feeding unit 8, and on to a third station which is occupied by a connecting apparatus 9. During advancement with the pushers 6, the sheets S travel along a helical path whose axis coincides with the axis of the shaft 1. The feeding units 7 and 8 may be of the type disclosed in U.S. Pat. No. 3,199,862 whose disclosure is incorporated herein by reference, the same as the disclosures of all other mentioned U.S. patents and of the copending patent application Ser. No. 682,918, now U.S. Pat. No. 4,614,290. The sheet feeding units 7 and 8 have means for opening the folded sheets S prior to entry of such sheets into the respective portions of the helical path, preferably while the sheets are in the process of moving into actual contact with the selected carriers 3. Each of the sheet feeding units 7 and 8 further comprises means for drawing a discrete sheet S from a stack of such sheets during each cycle of the machine so that each of the three carriers 3 receives a single first sheet S from the feeding unit 7 and a single second sheet S from the feeding unit 8 during each complete revolution of the hub 2. The arrangement is such that the withdrawing means of the units 7 and 8 withdraw successive lowermost sheets S from the respective stacks. The sheets S which are delivered by the opening means of the unit 8 straddle the sheets S which are delivered by the opening means of the unit 7 so that each carrier 3 advances an accumulation of two sheets S which ultimately reach the station for the sheet connecting apparatus 9. Each sheet S can constitute a composite sheet having several pairs of mutually inclined panels at the opposite sides of the ridge of the respective carrier 3.

Sheet feeding units which can be used in the machine of FIG. 1 are further disclosed in commonly owned U.S. Pat. Nos. 4,085,927, 4,491,311, 4,299,378 and 4,350,327.

The number of sheet feeding units can be increased to three or more, depending on the nature of products which are to be formed. Each pusher 6 advances from the sheet feeding unit 7 to the sheet feeding unit 8 or from the sheet feeding unit 8 to the connecting apparatus 9 during each complete revolution of the hub 2. An arcuate trough-shaped shroud 10 is provided to hold the sheets S on the carriers 3 against undesirable movements under the action of gravity and/or centrifugal force. The backs of sheets S on the carriers 3 slide along the concave inner side of the shroud 10 during a certain stage of each revolution of the hub 12. The shroud 10 extends all the way to the connecting apparatus 9 which comprises two staple applicators 12, 13 mounted on a yoke 11 which is caused to perform a pendulum movement about the axis of the shaft 1 as indicated by the arrow 111. The means for moving the yoke 11 relative to the shaft 1 is not shown in FIG. 1; such moving means can be identical with or analogous to the moving means 34 shown in FIG. 2. The staple applicators 12, 13 are angularly offset relative to each other by 120 degrees in the circumferential direction of the hub 2, and each of these applicators has means for applying two staples so that the sheets of each brochure are secured to each other at two spaced-apart locations as seen in the longitudinal direction of the back. It is clear that the illustrated applicators 12, 13 can be replaced with simpler applicators each of which is designed to apply a single staple, or with more complex devices for simultaneous application of three or more suitably spaced-apart staples. The yoke 11 is rocked back and forth at a speed such that, during the application of staples, the applicators 12 and 13 move with and at the exact speed of the hub 2 and carries 3 (about the axis of the shaft 1).

FIG. 1 shows that the pushers 6 are caused to travel along paths which terminate at the station for the connecting apparatus 9. Thus, each oncoming pusher 6 advances an accumulation of sheets S into the range of the staple applicator 12 or 13, and such pusher thereupon reverses the direction of its movement and is caused to advance back toward the station for the sheet feeding unit 7. Each accumulation which reaches the station for the connecting apparatus ceases to move axially of the shaft 1 but continues to orbit around the axis in a clockwise direction as seen in FIG. 1. Such movement is shared by the applicator 12 or 13 which is caused to apply a pair of staples whose legs penetrate through the backs of sheets in the respective accumulation and are upset by associated clinching devices 16 which are adjacent to the inner side of that portion of the path of sheets S which is adjacent the connecting apparatus 9. The clinching devices 16 have radially extending followers 17 which track stationary cams 18 mounted on or adjacent the respective end of the shaft 1 so that their axes coincide with the axis of the hub 2. The shroud 10 has an opening (e.g., a suitably configurated cutout) which allows the finished products in the form of brochures B (see FIG. 4) or the like to leave the respective carriers 3 at an ejecting station 14 by gravity and/or under the action of centrifugal force and to descend onto an endless belt conveyor 15 for transport to storage or to a further processing station. The machine of FIG. 1 comprises two mobile clinching devices 16 for each of the carriers 3, and such pairs of clinching devices are disposed in the respective carriers so that they share the orbital movements of the carriers about the axis of the shaft 1. The exact construction of the applicators 12, 13 and of the associated clinching devices 16 forms no part of the present invention. Reference may be had to U.S. Pat. No. 4,614,290 and to Swiss Pat. No. 549,443.

The number of carriers 3 can be reduced to two or increased to three or more without departing from the spirit of the invention. The carriers 3 are preferably equidistant from each other in the circumferential direction of the hub 2, and the machine is operated in such a way that it completes a cycle during the interval which is required to move the hub 2 through an angle of 360°/n wherein n is the number of carriers on the hub. The speed of rotation of the hub 2 can be reduced pro-

portionately with the increasing number of carriers. The same applies for the speed of the conveyors 5, i.e., the speed of the pushers 6 can be reduced by increasing the number of carriers 3.

The machine of FIGS. 2 to 4 has three sheet feeding units 7, 8 and 19 which are adjacent to three successive portions of the helical path of movement of sheets S toward the sheet connecting apparatus 9. The hub 2 of the sheet transporting device rotates about the axis of the shaft 1 and carries sixteen equidistant radially extending axially parallel carriers 3. The guides 4, chain conveyors and pushers (not specifically shown) are identical with or analogous to the parts 4, 5 and 6 of the sheet transporting device 1–6 in the machine of FIG. 1. The construction of the feeding units 7, 8 and 19 is the same; therefore, FIG. 3 merely shows the details of the sheet feeding unit 7. This unit comprises a belt conveyor 20 which delivers a stream of partially overlapping or non-overlapping folded sheets S˙toward an annulus of wedge-like pockets 21 which orbit about the axis of the hub 2 and have relatively wide inlets remote from and narrow funnel-shaped outlets 26 nearer to the shaft 1. If the sheets S are supplied in the form of a scalloped stream (as shown in the left-hand portion of FIG. 3), the trailing portion of each preceding sheet S overlies the leader of the next-following sheet. The pockets 21 are defined by pairs of flanges 22, 23 and by sidewalls 24, 25 which extend between the flanges in the axial direction of the shaft 1 and converge toward each other in a direction toward the respective carriers 3. The unit 7 has sixteen pockets 21, one for each carrier 3. The trailing sidewall 24 of each pocket 21 extends substantially radially of the flanges 22 and 23.

The outlet 26 of each pocket 21 is flanked by an idler roller 27 and a rotatable drum-shaped opening or spreading device 28. Each opening device 28 has a follower 29 which tracks a stationary cam 30 on the shaft 1. When a pocket 21 reaches the discharge end of the conveyor 20, the corresponding opening device 28 assumes the angular position which is shown above the nine-o'clock position of FIG. 3. A shoulder 31 of the opening device 28 then closes the respective outlet 26 so as to arrest a freshly delivered sheet S which has been lifted off the conveyor 20 by the respective trailing sidewall 24. As the hub 2 rotates in a clockwise direction (arrow 102), the freshly delivered sheet S slides along the respective sidewall 24 and comes into abutment with the shoulder 31 of the corresponding opening device 28. This can be seen at the 10½ o'clock position of FIG. 3. A gripping device 32 is then pivoted into engagement with the wider panel of the sheet S in the pocket 21 to hold the sheet in addition to the shoulder 31. The opening device 28 is then rotated through 90° in a clockwise direction, and the sheet S is pulled radially inwardly by the respective gripping device 32 so that the panel which is held by the gripping device also moves to one side of the respective carrier 3, i.e., the gripped panel is moved away from the other panel of the sheet. The hub 2 continues to rotate in the direction of the arrow 102 and the sheet S reaches the twelve o'clock position of FIG. 3 to be released by the gripping device 32 so that it can descend by gravity and straddles the respective carrier 3. The opening device 28 is then rotated counterclockwise back to its original position in which its shoulder 31 blocks the outlet 26 of the respective pocket 21. Alternatively, the opening device 28 can be rotated clockwise until it completes a full revolution about its own axis and returns its shoulder 31 to a posi-

tion adjacent the respective outlet 26. Such modification would merely necessitate a relatively simple alteration of means for rotating the opening device 28.

Each sheet S which is taken off the conveyor 20 completes a full revolution (sixteen machine cycles) during movement radially toward the axis of the shaft 1 (so that its panels straddle the respective carrier 3), and the sheet also advances along the carrier toward the station for the next-following sheet feeding unit 8. The conveyor 20 of the unit 8 then admits a second sheet which is manipulated in the same way as the sheet which has been delivered by the conveyor 20 of the unit 7 except that the second sheet comes to rest on the sheet which already straddles the respective carrier 3. A third sheet S is deposited on the second sheet during travel of the respective first and second sheets from the conveyor 20 of the sheet feeding unit 19 toward the station for the connecting apparatus 9 so that each carrier delivers an accumulation of three superimposed sheets wherein the first sheet rides directly on the carrier 3 and the second sheet is disposed between the first and third sheets. The number of sheet feeding units can be increased practically at will, depending on the nature of products whose sheets are to be stapled to each other. The length of the carriers 3 depends on the number of sheet feeding units and on the dimensions of the sheets S. The flange 23 of the sheet feeding unit 7 and the flanges 22, 23 of each of the units 8, 19 have suitable cutouts which enable the conveyors 5 and their pushers 6 to advance sheets S from the unit 7 to the unit 8, thence to the unit 19 and ultimately into the range of stapling means in the apparatus 9. Since the pushers 6 are designed to advance sheets S all the way to but not beyond the station for the connecting apparatus 9, each freshly gathered accumulation (of three sheets each) continues to orbit at the discharge ends of the carriers 3 but does not move axially of the shaft 1 so that it can be properly treated by the staple applicators 12, 13 and 33 as well as by the associated clinching devices (not specifically shown) of the apparatus 9. The applicators 12, 13, 33 are mounted on a support in the form of a yoke 11 which is rocked back and forth by the moving means 34 (see FIGS. 2 and 4) in such a way that the applicators travel with the respective accumulations during advancement of the accumulations toward the ejecting station 14 where the products leave the transporting device and descend onto the belt conveyor 15. The angular spacing between the neighboring applicators 12, 13, 33 (in the circumferential direction of the hub 2) is 22.5° because the transporting device of the machine of FIGS. 2–4 has sixteen equidistant carriers 3. The illustrated connecting apparatus 9 can be replaced with other connecting apparatus, e.g., with an apparatus employing one, two or more rotary stapling heads. The exact manner in which the movements of the applicators 12, 13, 33 and of the associated clinching devices are synchronized with the movements of accumulations of sheets S at the connecting station forms no part of the invention.

Newspaper stuffing apparatus wherein sheets are fed into orbiting pockets are disclosed in commonly owned U.S. Pat. Nos. 4,116,427, 4,124,203 and 4,133,521.

The utilization of a connecting apparatus with two or more staple applicators exhibits the advantage that a longer interval of time is available for the application of staples to discrete accumulations of sheets S during travel toward the ejecting station 14. Such connecting apparatus further contributes to a higher output of the machine, and the output can be increased still further by

**4,735,406**

employing a substantial number of equidistant carriers 3 and means (such as the shroud 10) for holding the sheets S on the carriers 3 against stray movements during travel in the axial direction of the transporting device toward the station for the connecting apparatus. The feature that several staple applicators are mounted on a common yoke 11 or on an analogous support contributes to simplicity of the machine. The feature that the pushers 6 need not advance the accumulations of sheets axially beyond the station for the connecting apparatus 9 contributes to compactness of the improved machine.

The utilization of sheet feeding units of the type shown in FIG. 3 is desirable and advantageous because the opening devices 28 have relatively long intervals of time to open the sheets S during advancement of the sheets from the respective pockets 21 toward and onto the corresponding carriers 3. Furthermore, such sheet feeding units enable the machine to turn out a large number of products per unit of time.

Without further analysis, the foregoing will so full reveal the gist of the present invention that others can, by applying current knowledge, readily adapt it for various applications without omitting features that, from the standpoint of prior art, fairly constitute essential characteristics of the generic and specific aspects of my contribution to the art and, therefore, such adaptations should and are intended to be comprehended within the meaning and range of equivalence of the appended claims.

I claim:

1. A machine for accumulating folded sheets into brochures and like products, comprising a sheet transporting device arranged to advance sheets having folded backs in a predetermined direction along a predetermined path and including at least two elongated parallel carriers and discrete conveyor means for each of said carriers, each of said conveyor means having means for advancing sheets along the respective carrier; and means for feeding sheets to said carriers so that the backs of the sheets straddle the respective carriers, comprising a first feeding unit having means for depositing first sheets onto successive carriers in a first portion of said path and at least one additional feeding unit having means for depositing second sheets over successive first sheets in a second portion of said path downstream of the first portion so that the backs of the second sheets straddle the backs of the respective first sheets and form therewith accumulations of first and second sheets wherein the backs of the second sheets are accessible.

2. The machine of claim 1, wherein the depositing means of said feeding units include means for supplying sheets into the respective portions of said path at predetermined intervals.

3. The machine of claim 1, further comprising means for connecting the sheets of the accumulations of sheets to each other in a third portion of said path downstream of said second portion, including means for stapling the backs of the accumulations to each other.

4. The machine of claim 3, wherein said connecting means includes means for simultaneously stapling the backs of sheets of a plurality of accumulations to each other.

5. The machine of claim 3, wherein said stapling means includes means for applying a plurality of staples to the backs of sheets of each accumulation of first and second sheets.

6. The machine of claim 1, further comprising means for connecting the sheets of the accumulations of sheets to each other, including a plurality of staple applicators and means for operating said applicators in synchronism so that each applicator can apply at least one staple to a discrete accumulation simultaneously with another applicator.

7. The machine of claim 1, wherein said transporting device comprises means for rotating said carriers about a predetermined axis.

8. The machine of claim 7, wherein said carriers are parallel to said axis.

9. The machine of claim 7, further comprising means for holding the sheets on said carriers against movement relative to the respective carriers under the action of gravity and/or centrifugal force.

10. The machine of claim 7, wherein said rotating means comprises a hub and said carriers extend from and substantially radially of said hub, said carriers being equidistant from each other in the circumferential direction of said hub.

11. The machine of claim 7, wherein said advancing means include means for delivering successive accumulations into said third portion of said path.

12. The machine of claim 11, further comprising means for connecting the sheets of the accumulations of sheets to each other in a third portion of said path downstream of said second portion, including a plurality of staple applicators and means for imparting to said applicators a pendulum movement about said axis.

13. The machine of claim 1, wherein each of said feeding units includes means for opening up successive sheets in the respective portion of said path.

14. The machine of claim 13, wherein each of said feeding units comprises a plurality of pockets, one for each of said carriers and each arranged to orbit about said axis in the respective portion of said path, and means for supplying folded sheets into successive pockets, each of said feeding units including discrete opening means for each of the pockets, said opening means including means for effecting the transfer of sheets from said pockets onto the respective carriers.

15. The machine of claim 14, wherein each of said pockets has an inlet remote from said axis and an outlet nearer to said axis and adjacent the respective opening means.

16. The machine of claim 14, wherein said feeding units further comprise stationary cam means and said transfer effecting means include followers tracking the respective cam means.

17. The machine of claim 1, further comprising means for connecting the sheets of the accumulations of sheets to each other in a third portion of said path downstream of said second portion, including means for stapling the backs of the sheets of accumulations to each other, said stapling means comprising at least one mobile staple applicator at one side of the third portion of said path and a mobile staple clinching device at the opposite side of the third portion of said path.

18. The machine of claim 17, wherein said connecting means further comprises a stationary cam for said clinching device and said clinching device comprises follower means tracking said cam.

19. The machine of claim 1, wherein each of said feeding units comprises means for opening folded sheets outside of the respective portion of said path.

20. The machine of claim 1, wherein said path is a helical path.

21. The machine of claim 14, wherein each of said pockets is wedge-shaped.

4,735,406

**11**

22. The machine of claim 1, wherein each of said feeding units comprises means for delivering a stream of partially overlapping sheets wherein each preceding sheet overlies the next-following sheet.

23. The machine of claim 22, wherein said delivering means includes means for conveying the sheets of the respective stream with the folded backs constituting the leaders of the sheets.

24. The machine of claim 23, wherein each of said feeding units further comprises means for opening suc-

**12**

cessive sheets of the respective stream including means for engaging the folded backs of the sheets.

25. The machine of claim 24, wherein said transporting device includes means for rotating said carriers and said opening means about a predetermined axis.

26. The machine of claim 1, wherein each of said feeding units includes means for opening folded sheets and said transporting device comprises means for advancing the carriers past said opening means.

27. The machine of claim 1, wherein each of said feeding units includes turnable means for opening folded sheets.

* * * * *

APPENDIX B

# United States Patent [19]

Reist

[11] 3,951,399

[45] Apr. 29, 1976

[54] ARTICLE-HANDLING APPARATUS

[75] Inventor: Walter Reist, Hinwil, Switzerland

[73] Assignee: Ferag AG, Hinwil, Switzerland

[22] Filed: Oct. 8, 1974

[21] Appl. No.: 513,175

[30] Foreign Application Priority Data

Oct. 10, 1973 Switzerland................... 14405/73

[52] U.S. Cl.......................................... 270/58; 270/60; 271/173

[51] Int. Cl.²........................................ B65H 39/065

[58] Field of Search ................... 270/58, 60, 54, 55; 198/209, 215; 271/172, 173

[56] References Cited

UNITED STATES PATENTS

1,165,757 12/1915 Cook .............................. 198/215 X

2,461,573 2/1949 Schweizer ...................... 270/55
2,876,008 3/1959 Mestre ............................ 270/58

Primary Examiner—Edgar S. Burr
Assistant Examiner—A. Heinz
Attorney, Agent, or Firm—Cushman, Darby & Cushman

[57] ABSTRACT

Apparatus for handling articles, e.g. newspapers or magazines, having a rotatable member divided into a number of axially-adjacent units. Each unit is divided into a number of radially-extending compartments having feeding devices for transferring articles fed to the compartment of one unit to the compartments of the adjacent unit where additional articles, e.g. inserts, may be added.

18 Claims, 25 Drawing Figures

PLAINTIFF'S EXHIBIT 3

Fig. 1

Fig. 2

Fig. 1a

Fig. 2a

Fig.3  Fig.4a  Fig.4b  Fig.4c  Fig.4d  Fig.4e  Fig.4f  Fig.5

Fig. 6

Fig. 7

Fig. 6a

Fig.7a

Fig.8

Fig.9

Fig.8a

Fig. 9a

Fig. 10

Fig. 11

Fig. 12a

Fig. 12b

Fig. 12c

3,951,399

**1**

## ARTICLE-HANDLING APPARATUS

### BACKGROUND OF THE INVENTION

#### 1. Field of the Invention

The present invention relates to apparatus for handling articles more particularly for the insertion of at least one insert into a folded printed article.

#### 2. Description of the Prior Art

Apparatus for placing inserts into articles, e.g. the magazine section into a newspaper are known in which articles are fed into a drum having radially-extending compartments, and the inserts are introduced during a half-rotation of the drum. This sequence of operation calls for a minimum time, at best in the order of 2 to 3 seconds, in view of the fact that the articles handled in this way are usually relatively sensitive paper products which must be supplied to and delivered from the apparatus.

If the properties of the known apparatus are compared to the production capacity of modern rotary printing machines, capable of delivering copies at the rate of 50,000 and more per hour, it will be seen that the known apparatus would be able to absorb the number of copies supplied by a rotary press only if the wheel has as many compartments and rotates or is driven at a rotational speed which would satisfy the following conditions:

The peripheral velocity (in terms of the number of compartments per second) must correspond to the maximum output of the rotary printing machine;

The time required by a compartment to traverse that part of the rotation of the drum in which the operations required for insertion are performed must not drop below the aforementioned minimum time.

It follows from this that the known apparatus would have to be provided with a drum containing approximately 100 compartments which rotate at a maximum speed of 12 revolutions/minute assuming that handling is at a maximum rate of 20 copies per second with a processing time of 2.5 seconds. These specifications clearly show that the size of the known apparatus would have to be unrealistically increased to gigantic proportions if it is able to process directly the production output from the rotary press.

It has therefore hitherto been the practice to supply the output of a printing machine to several sets of apparatus which in principle operate parallel with each other, this being equivalent to multiplying the apparatus demand and slowing down the products.

### SUMMARY

The handling apparatus of the present invention overcomes the above-described disadvantages by providing a drum comprising a plurality of axially-aligned units. Each of the units have radially-extending compartments which are provided with feeding devices for transferring the articles to adjacent units. Inserts or additional articles may then be added as the articles are moved through the adjacent units.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIGS. 1 and 1a show schematic perspective views of two embodiments of handling apparatus according to the invention,

FIGS. 2 and 2a show side views of part of the apparatus shown in FIGS. 1 and 1a,

**2**

FIG. 3 is a developed view of the external surface of the rotatable member of FIG. 1.

FIGS. 4a to 4f are diagrammatic sections along the lines a—a, b—b, c—c, d—d, e—e and f—f of FIG. 3,

FIG. 5 is a view similar to that of FIG. 3 showing a section of the drum but in another setting.

FIGS. 6 to 9 and 6a to 9a show diagrammatically sections along the lines VI-VI, VII-VII' – VII'', VIII-–VIII' – VIII'' and IX-IX of FIGS. 2 and 2a respectively, the sections along the lines VII-VII' – VII'' and VIII-VIII' – VIII'' extending along helical planes which are coaxial to the axis of the rotatable member,

FIG. 10 is a diagrammatic section through one of the units of the drum as seen in the direction of the arrow X of FIG. 2,

FIG. 11 is a detail of part of the drum illustrating the connection between two adjacent units, and

FIGS. 12a to c show diagrammatically (similar to FIGS. 6 to 9) separate views of adjacent units of handling apparatus for combining streams of overlapped articles.

### DESCRIPTION OF THE PREFERRED EMBODIMENT

The handling apparatus 10 shown in FIG. 1 comprises an elongate compartmented drum 11, which has a horizontal axis of rotation and is divided into a plurality of wheel units which abut axially upon each other and are fixedly joined to each other. As can be seen in FIGS. 1 and 2 two feed units 13 are arranged between an inlet unit 12 and a delivery unit 14. As will be explained in greater detail with reference to FIG. 11, the units 12 to 14 are detachably joined together by means of annular connecting members so that the units are rotatable together. The annular connecting members also form rails by means of which the drum 11 is freely supported on freely rotatable rollers 15. The rollers 15 are supported by arms 16 extending upwardly from a baseplate 17. The baseplate 17 is divided into abutting support units which are joined to each other, the number of support units being the same as the number of drum units. In FIG. 1 the support unit 18 associated with the inlet unit 12 has four arms 16, while the subsequent support units 19 are formed as so-called attachment support units each of which having two arms 16.

The drum 11 is driven by a geared motor 20 having a drive wheel 21 coupled by means of a chain or a toothed belt 23 to a driving pulley 22, which is fixedly connected to the inlet unit 12. The inlet unit 12 is driven in the direction of the arrow 24.

Supply means, constructed in this case as a conveyor belt 25 and two conveyor belts 26, are associated with the inlet unit 12 and the feed unit 13 respectively for a main article HP and for two inserts $VP_1$ and $VP_2$. The delivery unit 14 is associated with a delivery conveyor shown as a conveyor belt 27 for the end product EP.

As may be seen from FIG. 1, each of the drum units 12 to 14 is divided into a like number of radially-extending compartments which are outwardly open. Dividing walls between adjacent compartments are shown in the interest of simplicity as plane thin plates, but these dividing walls at least partially comprise the feed means associated with each of the compartments, as will be explained subsequently with reference to FIG. 10. Here it is sufficient to note that feed means are provided in each compartment of the drum units 12 to 14 and are able to transfer the contents of the compartment axially in the direction of the axially-succeeding

**3**

compartments.

This is shown particularly clearly in FIG. 2, which illustrates the relative position of the contents of the compartments in relation to the rotational position of the drum 11. FIG. 1 also shows that the peripheral surface of the drum 11 nearest to the baseplate is covered in sections by an endlessly co-rotating belt 28 so that the contents of the compartments are prevented from the dropping out when the compartments face the baseplate 17 as the drum 11 rotates.

As may be seen from FIGS. 1 and 3, the compartments of the inlet unit 12 are similar to those of the delivery unit 14, and the compartments of the two feed supply units 13 are of similar construction. The compartments in the inlet unit 12 and the delivery unit 14 are defined by side walls which also contain feed means although they are shown as plates in FIGS. 1 and 3. One example of such feed means will be described with reference to FIG. 10. Each of the units 12 to 14 also contain a thrust member 29 (shown merely as a circle in one of the compartments of the unit 12 in FIG. 3). The thrust member 29 is adapted to reciprocate in a controlled manner in the compartment from one side wall to the other for the purpose of pushing the contents of the compartment against the feed means. Embodiments of the thrust members 29 will also be described later with reference to FIG. 10.

Each of the compartments of both supply units 13 contain barriers or obstacles in the form of a wedge 30 tapering outwardly in the feed direction, i.e. from left to right in FIG. 3. The tapering surfaces of the wedge 30 adjoin two guide plates 31 and 32 which extend radially inwards into the respective compartment (see also FIG. 4c) and define a slot 33 between them for receiving one of the inserts $VP_1$ or $VP_2$. In the embodiment shown in FIG. 3 the wedge of each wedge in the compartments of the right-hand supply unit 13 directly adjoins the end of the corresponding guide plate 32 in the compartments of the preceding left-hand supply unit 13. As already mentioned, the units 12, 13 and 14 are fixedly joined to each other, but their relative rotational position is adjustable, as indicated for example at the position where the compartment of unit 12 merges into the first compartment of unit 13 in FIG. 3.

As already mentioned, feed means as well as at least one thrust member 29 are associated with each of the compartments of the units 12 to 14. One embodiment of the feed means and the thrust member 29 will be described with reference to FIG. 10, which shows a diagrammatic section through the inlet unit 12 or through the delivery unit 14, but only as seen in the direction of the arrow X of FIG. 2. In FIG. 10 roller tracks are shown in the region of the separating walls between adjacent compartments and comprise radially-extending rollers 35 which are freely rotatably supported at 37 in a tubular core 36 of the drum 11. Each of the rollers 35 is provided with a shaft stub 38 which extends into the interior of the core 36. Only one roller 35 of the roller track is shown in FIG. 10 because the roller tracks extend perpendicularly to the plane of the drawing. The shaft stubs 38 of the rollers of all roller tracks disposed at a given height of the wheel axis 11 therefore form a kind of pin ring with inwardly orientated, freely rotatable pins. In the course of one rotation the pin ring runs on one side cheek of a slotted link or stationary cam 39 which extends over the sector (end of the quadrant BC, quadrant CD and beginning of the quadrant DA) in which the feed means are to be

**4**

driven. Frictional engagement between the shaft stubs 38 constituting cam followers and the side cheek of the slotted link or cam 39 thus causes the rollers in the aforementioned sector to be driven so that the leading track surface of the roller tracks in FIG. 10 rotates to convey an article out of the plane of the drawing. The presence of a roller track with intermittently driven rollers itself is insufficient to ensure reliable and positive transfer of the contents of the compartments. To this end each compartment is associated with the thrust member 29 which is a spherical roller in the embodiment illustrated in FIG. 10. The thrust member 29 is supported so as to be freely rotatable at one end of a rocker lever 49 which in turn is connected to a trunnion 40 which extends parallel to the axis of the drum 11. The other end of the rocker lever 49, which extends to the interior of the core 36, supports a roller 41 which is freely rotatable and whose axis is parallel to that of the trunnion 40. The rocker lever 4 is biassed by means of a spring (not shown) into the position which is shown at the bottom right of FIG. 10. In the course of rotation of the drum 11 the roller 41 moves onto the radially-inner edge of the slotted link 39 and causes the rocker lever 49 to perform a pivoting motion against the bias in an anti-clockwise direction, so that the spherical thrust member 29 moves from one side wall of the compartment to the other side wall as shown at the bottom of FIG. 10. This causes the contents of the compartment to be thrust against the roller track (as shown in the 2nd compartment of quadrant CD), so that the contents are advanced in the direction out of the plane of the drawing if the roller track is driven. As soon as the roller 41 drops off the inner edge of the slotted link 39, the thrust member 29 again moves back to the other side wall from left to right as shown in quadrant DA of FIG. 10.

FIG. 11 shows how adjacent units 12 and 13 of the drum 11 are joined together by annular connecting members in the form of threaded rings 42, 43. The rings 42, 43 are screwmounted to each other and their external surface forms a circular rail which engages in the track between track rings 15' and 15'' of the rollers 15 (see also FIG. 1). On releasing the rings 42, 43 the relative annular position of adjacent units can be adjusted easily. The second supply unit 13 is connected in a similar way to the first supply unit 13 and the delivery unit 14. Furthermore, the drum 11 is easy dismantlable to remove one or more units for repair or maintenance purposes. The removal of one or more of the units also allows ready access to the interior of the tubular core 36 of the drum 11. The construction of the drum 11 as well as of the baseplate 17 from component units enables the entire apparatus to be extended by a plurality of further supply units without the need for modification of the drive.

## OPERATION

The operation of the handling apparatus is described with reference to FIGS. 3 and 4a to f. The main article HP disposed in one compartment of the inlet unit 12 is advanced in the course of rotation of the drum 11 towards the succeeding feed or supply unit 13 and into one of its compartments. Prior to being transferred from the compartment of the inlet unit 12 into the compartment of the supply unit 13 the main article HP is subjected to lateral thrust applied by the thrust member 29 and thus bulges slightly as illustrated in FIG. 4a so that a gap is formed in the main article HP into

which gap the edge of the wedge 30 is able to penetrate in the succeeding compartment. Since the feed motion is positive the wedge 30 penetrates into the main product HP and opens it as illustrated in FIG. 4b, and in the second to top compartment of the supply unit 13 on the left in FIG. 3. The thrust force of the thrust member 29, not shown further in FIG. 3, is then removed and the opened main article drops on to the floor of the compartment in the supply unit 13 but the guide plates 31 and 32 keep the article HP in the open position. At this moment the first insert VP₁ is inserted through the slot 33, as illustrated in FIGS. 3 and 4c, in such a way that the insert drops into the opened main article HP. The edges of the wedges 30 of the right-hand feed or supply unit 13 in FIG. 3 are aligned with the guide plates 32 of the corresponding compartments of the left-hand supply. Therefore, as the article HP with one insert VP₁ moves from the left-hand to the right-hand supply unit 13, the insert VP₁ is merely pushed to one side as shown in FIG. 4d so that space is provided (FIG. 4e) for the insertion of a second insert VP₂. The article which has been further advanced and has now become the end product EP is then made available in the delivery unit 14 for delivery, a procedure which will be described with reference to FIG. 9.

FIGS. 3 and 4a to f illustrate the operation in a time scale which has been greatly speeded up. FIGS. 6 to 9 on the other hand represent diagrammatic instantaneous views of cross-sections of the inlet unit 12, of the two feed or supply units 13 and of the delivery unit 14, the instantaneous position of the contents of the appropriate compartments being shown in dependence on the particular rotational position with respect to the axis of rotation of the drum 11.

FIG. 5 shows that the edge of the wedge 30 can also be arranged midway between the guide plates 31 and 32 of the preceding compartment by appropriate adjustment of the right-hand supply unit 13 relative to the preceding supply unit 13. It is therefore possible for the initially-inserted insert VP₁ to be centrally opened on transfer from the first supply unit 13 into the succeeding supply unit 13 so that the insert VP₂ is inserted within the insert VP₁.

To facilitate understanding FIGS. 6 to 9 four quadrants AB, BC, CD and DA are shown, each of the quadrants containing six compartments. Since each compartment has a different angular position it is also possible to regard FIG. 6 as superimposed images of one compartment in twenty-four different rotational positions. FIG. 6 shows that an article HP supplied by the conveyor 25 is about to drop into the second compartment of the quadrant AB. The article falls into the compartment until the fold arrives at the bottom of the compartment (5th compartment). The fold remains at the bottom of the compartment until the compartment enters the quadrant BC and begins to tip downwardly (2nd compartment in quadrant BC). The article HP then begins to slip radially outwardly until it bears on the part of the belt 28 nearest to the drum 11 (5th compartment in the quadrant BC). The feed device associated with the compartment begins to act in the radial direction on changeover from quadrant BC to quadrant CD and at the same time the thrust member 29 moves from one side of the compartment to the other side to push the article HP against the feed device (2nd compartment in the quadrant CD). The thrust member 29 produces a bulge in the article HP (3rd compartment in the quadrant CD) and since the arti-

cles are simultaneously moved axially from the inlet unit 12 to the first supply unit 13, the gap resulting from the bulge moves on to the end of the wedge 30 of the first supply unit 13. The article is fed axially as far as the quadrant DA so that the article is advanced from the compartment of the inlet unit 12 into the axially succeeding compartment of the first supply unit 13. In other words, the compartments of the inlet unit 12 are emptied in the course of traversing through the quadrant DA and at the same time the thrust member 29 returns from its clamping position to the oppositely disposed side wall of the compartment (4th to 6th compartment in quadrant DA and 1st compartment in quadrant AB).

When the article HP is being transferred to a compartment of the axially-adjacent supply unit 13 (FIG. 7, 3rd compartment in quadrant CD) the article moves on to the edge of the wedge 30 as already mentioned, and is opened thereby during axial feed motion. The thrust member then returns into its inoperative position (6th compartment CD and 1st compartment BA, FIG. 7). The article which is now held open by the guide plates 31 and 32 is advanced further by its trailing edge into the appropriate compartment of the supply unit 13 and drops back onto the bottom of the compartment (4th to 6th compartment in quadrant DA, FIG. 7) and then continues its rotation in open V-shape. An insert VP₁ is then inserted into the second compartment of the quadrant AB, FIG. 7, so that it is located in the opening of the article HP (2nd to 4th compartment in quadrant AB, FIG. 7). The procedures already described in conjunction with the quadrant BC of FIG. 6 are then basically repeated, the only difference being that they take place in a compartment of a supply unit and therefore apply to first insert VP₁, as well as to the article H.

By analogy, the procedures which are illustrated in FIG. 8 correspond to those of FIG. 7 except that in this case a second insert VP₂ is added. The end product EP (corresponding to HP + VP₁ + VP₂) is practically completed and ready for delivery in the 5th and 6th compartment of the quadrant BC of FIG. 8. To this end, it is initially advanced further into the corresponding compartments of the delivery unit 14 which, in contrast with the compartments in the supply units 13, have no obstacles or barriers. This procedure is illustrated in FIG. 9 (2nd compartment in the quadrant CD to 6th compartment in the quadrant DA of FIG. 9). After a certain settling time the end product EP drops either by its own dead weight or assisted by stationary guide rails 34 (FIG. 9) on to the delivery conveyor 27 which extends away from the delivery unit 14 and is driven from below.

The advantages of the above described apparatus are evident. Firstly, by arranging the units of the drum 11 in the axial direction the articles travel over a substantially helical path while being processed, i.e. they can be allowed to remain in the drum 11 for several rotations so that the minimum time required for handling can be easily obtained without the need for increasing the diameter of the wheel. The maximum production rate of a modern rotary printing machine can also be absorbed by means of the relatively modest dimensions. As an example it should be mentioned that a production rate if 36,000 copies/hour can be "absorbed" with an external diameter of approximately 1200 mm, a depth of compartments of approximately 350 mm, and 24 compartments at a speed of 25 revolutions/min, approximately 4 to 5 seconds being available

**7**

for the passage of one copy through the system (from the inlet unit to the delivery unit). The construction of the drum 11 in separate drum units, also permits modular extension of the drum, i.e. the apparatus can be readily adapted to individual requirements and practices by the addition or omission of one or other unit.

### MODIFICATIONS

In FIGS. 1a, 2a and 6a – 9a reference numerals have been inserted only for parts mentioned subsequently. In order to avoid repetition, the following description is confined merely to differences of construction and operation between this and the previously-described embodiment.

As may be seen in FIG. 1a, and more particularly in FIGS. 6a to 8a, the main article and the inserts are supplied by means of conveyors 52. Each conveyor 52 is provided with spaced jaws 53. The articles 55 which are conveyed in an overlapped formation on the upper stretch of the conveyor, which passes over a reversing pulley 54, are gripped by the gripper jaws along the trailing edge so that when the jaws 53 pass around the reversing pulley 54 into the lower stretch of the conveyor 52 the articles become suspended as indicated at 55'. The bottom stretch of the conveyor 52 extends approximately tangentially to the wheel, the jaws being arranged at distances in accordance with the spacing of the components so that they mesh with the compartments in the manner of a rack and pinion. The downwardly depending articles 55' are thus inserted into the compartments of the wheel and, as illustrated at 56, are released approximately in the region of the top of the wheel by opening of the jaws. This applies to the main articles as well as to the inserts. Proceeding from FIG. 6a the articles are then displaced axially while being opened by wedges and in the course of the continued feed motion the first insert and, where appropriate after opening thereof, the second insert is also supplied.

In contrast with the first embodiment the articles in each unit are gripped by the thrust members 29 before the articles leave the quadrant AB and are retained in the quadrants BC and CD so that they cannot drop out. This dispenses with the closure comprising the endless belt 28 in the previous embodiment. No radial reciprocating motion of the articles therefore occurs in this case.

The relationship between FIGS. 2a and FIGS. 6a to 8a is the same as that between FIGS. 2 and 6 to 8. There is merely a phase shift in the sense that the articles are introduced while they are still in the quadrant DA and not only when they reach the quadrant AB. This also applies to the inserts. The procedure remains fundamentally unchanged so that FIG. 2a is readily understandable in the light of the description of FIG. 2.

In this embodiment, the end products could also be removed in accordance with the steps disclosed in FIG. 9. However, a conveyor 58 (FIGS. 1a and 9a) is provided. Like the conveyor 52 the conveyor 58 is also provided with jaws 57 and passes around a reversing pulley 59, so that its bottom stretch passes over the drum in the form of an arc as shown in FIG. 9a for removing the end products. In this arrangement the distance between adjacent jaws 57 also corresponds to the spacing of the compartments of the drum so that the jaws 57 mesh with the compartments. Provision is made to ensure that the jaws 57 are opened as they pass around the roller 59, so that the article plus inserts is introduced into an opened jaw, as may be seen at 60.

**8**

The jaws 57 are then closed as shown at 61 so that the articles gripped thereby are lifted out of the compartments after passing over the top of the drum. The articles are conveyed in a suspended condition and can then be further processed, for example they can be laid out in an overlapped delivery, stacked etc.

As already mentioned, the above described apparatus is not limited to the insertion of inserts into articles. Independently thereof, or where appropriate in combination therewith, it is possible for numerous other operations to be performed, a few examples of which will now be described.

According to FIG. 12 the apparatus is intended to combine two streams of overlapped material into a resultant overlapped stream. In FIG. 12a articles are supplied to the first compartment of the first unit of the drum by a conveyor 62, so that one article is inserted into only every other compartment. A similar procedure takes place by means of a further conveyor 63 (FIG. 12b) in an adjacent unit of the drum, and the articles in the first unit are moved axially into the empty compartments of the adjacent unit. The articles of two mixed streams are fed into the adjacent unit (FIG. 12c) by axial feed (designated by $V_A$), and are then removed by means of a conveyor 64 in a manner already described. As can be seen, the two streams of articles are fed in a staggered relationship rather like the teeth of a sliding clasp fastener. The articles delivered by the conveyor 64 can be laid out into a single overlapped stream. To explain the operation more clearly the rotational sections are indicated with or without axial feed ($V_A$) in FIGS. 12a to c.

It will be realized that the above-described embodiments may be used for performing a variety of operations. For example, the various sections of a journal or magazine may be assembled by supplying firstly the cover and then successively the sections as inserts, each of these being opened for the next insert. This procedure can be referred to as assembly from outside to inside. Sections can also be assembled adjacently in an opened cover, for example in bookmaking. Assembly may also take place from the inside to the outside, the innermost section being supplied to one end of the wheel and the successive further outwardly disposed sections being supplied subsequently.

Furthermore, the above-described operation could be reversed, i.e. for separating articles. A stream of articles supplied to the delivery unit would be moved axially to the adjacent unit, and only the articles in alternate compartments would be removed by a conveyor having jaws. The remaining articles would then be moved axially into the next adjacent unit and similarly removed.

Finally, it should be mentioned that cutting tools, folding tools and the like can be associated with the compartments in order to perform appropriate operations.

What is claimed is:

1. Apparatus for handling printed sheet products, comprising:

a drum;

means for rotatably driving said drum about a longitudinal axis;

means dividing said drum into a plurality of compartments extending radially of said axis;

means for supplying said products to the compartments at one location along said drum;

3,951,399

means individual to each of said compartments for axially advancing the products in said compartments in synchronism with the rotation of the drum from said one location to a second location along said drum; and

means for removing said products from the compartments at said second location.

2. Apparatus according to claim 1, further comprising means within the compartments, intermediate ends of said drum, for manipulating said products as they advance.

3. Apparatus according to claim 2, wherein said products are folded and wherein said manipulating means within the compartments include axially-extending wedges for opening said folded products as they are advanced within the wedge-containing compartments.

4. Apparatus according to claim 3, further comprising spaced guide plates within each wedge-containing compartment, said plates being related to the wedges to retain the product in an opened condition within said compartments.

5. Apparatus according to claim 4, wherein each pair of said guide plates defines a slot and wherein said apparatus further includes means for introducing additional products to said drum within said slots.

6. Apparatus according to claim 2, wherein said products are folded and wherein said manipulating means within the compartments include axially spaced sets of axially-extending wedge-shaped members, said compartments having opposite side walls defining with said wedge-shaped members axially spaced and axially-extending feed ducts; radially extending walls connected to said wedge-shaped members and defining axially spaced sets of slots extending radially into said feed ducts; and a supply device associated with each axially spaced set of slots.

7. Apparatus according to claim 6, wherein each supply device comprises a conveyor; gripper jaws on said conveyor; and means for moving said conveyor substantially tangentially over said drum, the gripper jaws being arranged to align with said slots and to open for dropping products into said slots.

8. Apparatus according to claim 1, wherein said advancing means for each compartment comprises:

a plurality of rollers having longitudinal axes lying substantially in a plane which includes the longitudinal axis of said drum, and means for rotating said rollers during at least a portion of a rotation of said drum.

9. Apparatus according to claim 8, wherein said means for rotating the rollers comprises a stationary cam and means operatively related to said rollers for engaging said cam during rotation of the drum to impart rotation to the rollers.

10. Apparatus according to claim 9, wherein said drum includes a central core about which said compartments are located, said stationary cam being positioned within said core.

11. Apparatus according to claim 10, wherein said rollers include stub portions extending within the core so as to engage the cam during rotation of the drum to thereby impart rotation to the rollers.

12. Apparatus according to claim 8, wherein said advancing means for each compartment further includes:

means for thrusting a product within said compartment against said rollers during rotation of the rollers.

13. Apparatus according to claim 12, further comprising:

a cam; and

follower means operatively associated with said thrusting means for engaging said cam during rotation of the drum to move said thrusting means from an inoperative position to an operative position wherein said thrusting means engages said product to thrust the product against the rollers.

14. Apparatus according to claim 1, wherein said axis is substantially horizontal and said products are supplied to the drum, and removed therefrom, at the periphery of the drum, the apparatus further comprising:

retaining means associated with said periphery for preventing products from falling out of said compartments during rotation of the drum.

15. Apparatus according to claim 14, wherein said retaining means comprises an endless belt positioned below said axis and covering a portion of the periphery of said drum as the drum rotates.

16. Apparatus according to claim 1, wherein the axis of said drum is substantially horizontally disposed and wherein said removing means comprises a conveyor extending tangentially away from the underside of said drum.

17. Apparatus according to claim 1, wherein said advancing means for each compartment comprises:

a stationary cam; and cam follower means mounted on said drum for rotation therewith and for driving said advancing means upon contact of said cam follower means with said stationary cam.

18. Apparatus according to claim 17, wherein said drum includes a central core; and said stationary cam is positioned within said core.

* * * * *